Johnnie Russ, by her guardian Marion Schwartz, Plaintiff-Appellant,

v.

Elliott Russ, Defendant-Respondent.

Supreme Court

*No. 2005AP2492. Oral argument April 26, 2007. —Decided July 3, 2007.*

2007 WI 83

(Also reported in 734 N.W.2d 874.)

265

For the plaintiff-appellant there were briefs by *Jeffrey R. Myer, Ann Laatsch,* and *Legal Action of Wisconsin, Inc.,* Milwaukee and oral argument by *Jeffrey R. Myer.*

For the defendant-respondent there was a brief by *Barry Buckspan* and *Weigel, Carlson, Blau & Clemens, S.C.,* Milwaukee and oral argument by *Barry Buckspan.*

¶ 1. N. PATRICK CROOKS, J. This appeal is before the court on certification from the court of appeals, pursuant to Wis. Stat. § 809.61 (2003–04)[1]. Johnnie Russ (Johnnie) appeals from an order of the Milwaukee County Circuit Court, Judge Daniel A. Noonan presiding, dismissing Johnnie's complaint against her son,

[1] All further references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

Elliott Russ (Elliott), with prejudice. The complaint, which was filed on Johnnie's behalf by her guardian, Marion Schwartz (Schwartz), alleged that Elliott breached his fiduciary duty as Johnnie's agent under a power of attorney (POA), and that he engaged in conversion of funds from a joint checking account that he and Johnnie opened prior to the execution of the POA document.

¶ 2. Johnnie appealed the circuit court's dismissal of her complaint, and the court of appeals certified the following three issues to this court:

> (1) Whether the fiduciary duty of a POA agent, pursuant to Wis. Stat. § 243.10, prevents the agent from using the principal's funds for the agent's personal use when such funds have been deposited into a joint checking account, inasmuch as joint account holders do not owe each other any duty under Wis. Stat. § 705.03, and whether a POA constitutes "clear and convincing evidence of a different intent" under § 705.03?

> (2) Whether a POA document may be reformed on grounds of mutual mistake, based on: (1) extrinsic evidence of the principal's intent; (2) the lack of an accounting requirement in the POA; or (3) the fact that the principal and agent lived in the same household in a familial relationship, to effectively overcome the fiduciary duty inherent in the POA?

> (3) Whether a POA principal may be equitably estopped from enforcing the agent's fiduciary duty not to self-deal because the principal and agent lived in the same household in a familial relationship?

¶ 3. We hold that a joint checking account established under Wis. Stat. § 705.03 prior to the execution of a POA creates a presumption of donative intent, and that the transfer of funds from such joint account by an agent acting under a POA, but for the agent's own use, creates a presumption of fraud, unless the POA explic-

itly authorizes self-dealing.[2] We further hold that when, as in the present case, these two conflicting and inconsistent presumptions coincide, the circuit court is free to make a determination based on the facts and the credibility of the witnesses, as the circuit court did here. We are also satisfied that, while the circuit court here reformed the POA document on the basis of mutual mistake, and held that equitable estoppel barred Johnnie's claim, that such an approach should not be undertaken in future cases. Rather, a circuit court should decide conflicts between Wis. Stat. § 705.03 and the fiduciary duties imposed by a POA executed under Wis. Stat. § 243.10, in the manner discussed herein.

## I

¶ 4. Johnnie was born in 1926. In 1985, she suffered a stroke and had health problems thereafter.[3] In 1992, Johnnie moved in with her son, Elliott, and his wife, Doris Russ (Doris), where she remained for the next nine years. That same year, Johnnie and Elliott opened a joint bank account into which they agreed to deposit all of Johnnie's income,[4] which consisted of

---

[2] In this case, the POA did not explicitly authorize self-dealing.

[3] We have been informed by her counsel, in a letter dated May 24, 2007, that Johnnie Russ died on May 5, 2007. This case is not moot, however, because the issues are likely to arise again, and a decision from this court should alleviate uncertainty on such issues. *In re Commitment of Schulpius*, 2006 WI 1, ¶ 15, 287 Wis. 2d 44, 707 N.W.2d 495. Johnnie's attorney also informed us that Johnnie's estate wishes to continue the claim against Elliott Russ.

[4] There is no evidence that Elliott or Doris deposited any of their income into the account.

monthly social security benefits, City of Milwaukee pension payments, and a small amount of oil royalties.

¶ 5. On February 26, 1999, without the assistance of an attorney, Johnnie executed a durable Wisconsin Basic Power of Attorney for Finances and Property,[5] pursuant to Wis. Stat. §§ 243.10 and 243.07, designating Elliott as her agent. It is undisputed that the entire document was read aloud at the time of execution. Johnnie granted Elliott all the powers on the first page of the form, authorizing him to, among other things, pay her bills and manage her bank accounts. However, she left the second page blank, choosing not to authorize Elliott to be compensated for his services or to have general authority, which would allow him to make gifts. She also did not obligate Elliott to provide her with a periodic accounting.

¶ 6. After executing the POA, the parties continued living together as they had before, maintaining their previous financial arrangement. In March of 2001, due to her deteriorating health, Johnnie was admitted to a hospital, and later a nursing home. On October 10, 2002, the circuit court declared Johnnie incompetent, appointed Schwartz as Johnnie's guardian, and terminated the durable POA.

¶ 7. On March 10, 2003, Schwartz filed this suit on Johnnie's behalf. Johnnie sought recovery of funds that Elliott withdrew from the joint account between March 1999 and April 2002, while he was her POA agent,[6] for expenses related to himself, his business,

---

[5] Johnnie used the "Wisconsin Basic Power of Attorney for Finances and Property" statutory form found in Wis. Stat. § 243.10. Johnnie also executed a Wisconsin Power of Attorney for Health Care, appointing Elliott as her agent.

[6] Johnnie does not seek recovery for any funds withdrawn from the joint account before Elliott became her POA agent.

and his wife. Johnnie alleged that by using the joint account, which contained her funds, for his own expenses, Elliott breached his fiduciary duty as her POA agent. During the contested period, $45,172.44 of Johnnie's funds were deposited into the joint account. The parties stipulated that, between February 1999 and October 2002, the total amount of checks written from the joint account for the benefit of Elliott was $34,379.91.

¶ 8. In the circuit court, Johnnie argued that Elliott's use of her funds from the joint account constituted self-dealing. She maintained that any authority to self-deal had to be written into the POA, and that because the POA did not authorize Elliott to make gifts or be compensated, it did not permit him to self-deal. Elliott argued that because the funds in a joint account belong to all account holders under Wis. Stat. § 705.03, he was entitled to spend the money, regardless of his role as Johnnie's POA agent. He also argued that any money he used for his own benefit was offset by the value of the care he had provided Johnnie.

¶ 9. On August 2, 2004, Milwaukee County Circuit Court, Judge Daniel A. Noonan presiding, granted Johnnie's motion for summary judgment, and ordered a hearing on damages. Judge Noonan concluded that Wis. Stat. § 705.03 did not alter Elliott's fiduciary duty to Johnnie as her POA agent to put her interests above his own in matters related to the agency. Specifically, he ruled that Elliott had a fiduciary duty to prevent Johnnie's funds from being deposited into a joint account to which another party had access.

¶ 10. On April 26, 2006, at a hearing on damages, the circuit court altered the August 2nd decision by setting aside the summary judgment and dismissing Johnnie's claim on the merits. Based on additional

evidence presented at this hearing, the court held that, as Johnnie's POA agent, Elliott had assumed the fiduciary duty "to take care of" Johnnie, and that he had not breached this duty. The circuit court entered written findings of fact and conclusions of law. The circuit court found that Johnnie had willingly agreed to her living arrangement, including Elliott's use of the joint account. However, the court recognized that the parties failed to execute a POA document that accurately reflected their intentions. Therefore, the court applied the equitable doctrine of mutual mistake to reform the POA document to authorize Elliott to have free use of Johnnie's money in the joint account. Additionally, the circuit court concluded that equitable estoppel barred Johnnie's claim.

¶ 11. Johnnie moved for reconsideration, and the motion was denied. She then appealed to the court of appeals, which certified the case to this court. This court accepted certification.

## II

■ ¶ 12. This case requires this court to review the circuit court's order dismissing Johnnie's action with prejudice. When reviewing a circuit court's order of dismissal, we are faced with a question of law, which we review de novo. *Ford v. Kenosha County,* 160 Wis. 2d 485, 494, 466 N.W.2d 646 (1991). The circuit court's findings of fact will not be set aside unless they are clearly erroneous. Wis. Stat. § 805.17(2). Additionally, the application of a statute to undisputed facts presents a question of law that we review de novo. *State v. Setagord,* 211 Wis. 2d 397, 405–06, 565 N.W.2d 506 (1997).

¶ 13. Ordinarily, the admissibility of evidence is a discretionary decision for the circuit court, but in *Praefke v. American Enterprise Life Insurance Company*, 2002 WI App 235, ¶ 7, 257 Wis. 2d 637, 655 N.W.2d 456, the court of appeals treated the question of whether extrinsic evidence is permissible for the interpretation of a POA document as a question of law, which this court reviews de novo.

### III

¶ 14. Johnnie argues that the fiduciary relationship created by a POA under Wis. Stat. § 243.10 is, as a matter of law, "clear and convincing evidence of a different intent" from the joint account provisions of Wis. Stat. § 705.03[7]. Johnnie asserts that, immediately above Elliott's signature on the POA document, there is declaration in bold face, capital letters that states: "BY ACCEPTING OR ACTING UNDER THE APPOINTMENT, THE AGENT ASSUMES THE FIDUCIARY AND OTHER LEGAL RESPONSIBILITIES AND LIABILITIES OF AN AGENT." Johnnie argues that

---

[7] Wisconsin Stat. § 705.03 states in relevant part:

Unless there is clear and convincing evidence of a different intent:

(1) A joint account belongs, during the lifetime of all parties, to the parties without regard to the proportion of their respective contributions to the sums on deposit and without regard to the number of signatures required for payment. The application of any sum withdrawn from a joint account by a party thereto shall not be subject to inquiry by any person, including any other party to the account and notwithstanding such other party's minority or other disability, except that the spouse of one of the parties may recover under s. 766.70. No financial institution is liable to the spouse of a married person who is a party to a joint account for any sum withdrawn by any party to the account unless the financial institution violates a court order.

Elliott's signature on the POA document is clear and convincing evidence that he intended to accept the fiduciary duties of an agent.

¶ 15. Johnnie further asserts that a POA agent may not engage in self-dealing unless the power to self-deal is written in the POA document. She cites *Alexopoulos v. Dakouras,* 48 Wis. 2d 32, 41, 179 N.W.2d 836 (1970), and *Praefke,* 257 Wis. 2d 637, ¶¶ 14, 16, in support of her argument. In *Alexopoulos,* 48 Wis. 2d at 41, this court held that a POA created pursuant to Wis. Stat. § 243.10 creates an agency relationship that imposes a fiduciary duty on the attorney-in-fact, or POA agent.

¶ 16. In *Praefke,* the petitioner, Heidi Praefke (Praefke), was the attorney-in-fact for an elderly friend, Betty Glasslein (Glasslein). Praefke used the authority conveyed by the POA document to change the beneficiary designations on Glasslein's life insurance policies to herself and to make cash gifts to herself and others from Glasslein's checking account. *Id.,* ¶ 3. Praefke argued that she did not breach her fiduciary duty to Glasslein because the POA document gave her the authority to make gifts. *Id.,* ¶ 6. Praefke further argued that, even if the POA document did not expressly state that she had the authority to make gifts, she could provide extrinsic evidence, in the form of an affidavit, that proved Glasslein had requested that Praefke make such gifts. *Id.,* ¶ 14. The court of appeals in *Praefke* relied on *Alexopoulos* in stating that there is a "bright-line rule that an attorney-in-fact may not make a gift to himself or herself unless there is an explicit intent in writing from the principal allowing the gift." *Praefke,* 257 Wis. 2d 637, ¶ 16.

¶ 17. Johnnie cites a third case, *Losee v. Marine Bank,* 2005 WI App 184, 286 Wis. 2d 438, 703 N.W.2d

751, in support of her argument that Elliott is liable for self-dealing, because he used money from the joint account he held with Johnnie for the benefit of himself, his business, and his wife. In *Losee,* a mother, Helen Losee (Helen), executed a POA document in 1994 designating her son, John, as attorney-in-fact. *Id.,* ¶ 4. In 1997, Helen executed an assignment of rents and a mortgage against her condominium to secure a loan for John's business. *Id.,* ¶ 17. The terms of the mortgage provided for the securing of future advances up to $1,000,000. *Id.,* ¶ 4. Future advances thereafter were made within the $1,000,000 limit. *Id.,* ¶ 5. In 2001, John invoked the authority conferred by the POA document to release the original mortgage on Helen's condominium so that it could be sold. *Id.,* ¶ 6. The proceeds of the sale were placed in a certificate of deposit at Marine Bank. John then executed an Assignment of Deposit Account, in which Helen was named as the grantor, John's business was named as the borrower, and Marine Bank was named as the lender with a security interest. *Id.* John defaulted, Marine Bank seized the security, and Helen sued Marine Bank alleging that John engaged in self-dealing in continuing the pledge of her assets after her mortgaged condominium had been sold. *Id.,* ¶ 7. The circuit court granted summary judgment to Marine Bank. The court of appeals reversed and granted judgment in favor of Helen. *Id.,* ¶ 10. The court of appeals reasoned that, although the facts were different from those in *Praefke* because Helen executed the original mortgage without implicating the POA, and because there was no evidence that John acted out of greed, the principles of *Praefke* were nonetheless applicable. *Id.,* ¶¶ 15–16. The court noted that, according to the holding in *Praefke,* an attorney-in-fact has a fiduciary obligation to

the principal, and cannot make gratuitous transfers of the principal's assets unless the POA expressly grants the authority to do so. *Id.,* ¶¶ 14, 16. The court of appeals concluded that John's interests, not Helen's, prompted his decisions, and that John engaged in self-dealing. *Id.,* ¶¶ 20–21.

¶ 18. Johnnie argues that, under the reasoning of *Alexopoulos, Praefke,* and *Losee,* Elliott should be held liable for engaging in self-dealing in violation of his fiduciary duty to Johnnie. Johnnie further argues that a conflict exists between Wis. Stat. § 705.03, under which Elliott owed no duty to Johnnie as a joint account holder, and Elliott's fiduciary duty as a POA agent pursuant to Wis. Stat. § 243.10. Johnnie asserts that there are three possible ways to resolve this conflict. First, she suggests that this court could adopt a bright-line rule, which would provide that the existence of a POA relationship is "clear and convincing evidence of a different intent" within the meaning of the introductory clause of § 705.03.

¶ 19. Second, Johnnie suggests that the court could adopt a rule stating that Wis. Stat. § 705.03 provides immunity, for breach of fiduciary duty as to funds taken from a joint account held in the names of both the POA principal and POA agent. Johnnie argues that the immunity approach would be too broad, and that such an approach would endanger the principal's funds, because any and all funds that enter the joint account could be plundered with impunity and no accountability.

¶ 20. Finally, Johnnie states that the court could engage in a case by case inquiry of the intent of the parties as to the POA relationship with respect to the joint account. She argues that this court should not adopt a case by case approach, because such an approach would lend itself to a great deal of litigation and appeals.

¶ 21. Johnnie asserts that, out of the three suggested approaches, this court should adopt the bright-line rule that the existence of a POA relationship is "clear and convincing evidence of a different intent" within the meaning of the introductory clause of Wis. Stat. § 705.03. Such a rule, she argues, would provide predictability and be easy to apply, while also allowing the principal the flexibility to authorize self-dealing in the POA document, if he or she so desired.

¶ 22. Elliott argues that the use of a preexisting joint account is not affected by the fiduciary duty established by a subsequently executed POA document, unless the POA document so provides, or there is clear and convincing evidence of a different intent outside of the POA document that would apply to the provisions of Wis. Stat. § 705.03. Elliott asserts that the joint account held by himself and Johnnie was opened prior to the execution of the POA document. He argues that there was no change in the use of the joint account before and after execution of the POA document.

¶ 23. Elliott argues that, by completing the first page of the POA document and leaving the second page blank, Johnnie authorized Elliott to pay her bills, manage her accounts, and do banking on her behalf, but did not authorize him to be compensated for his services nor to make gifts. Elliott further asserts that Johnnie chose not to initial line item number 14, which would have required Elliott to render an accounting. Elliott argues that the facts in this case do not amount to "clear and convincing evidence of a different intent" under Wis. Stat. § 705.03.

¶ 24. Elliott further argues that this case is distinguishable from *Alexopoulos, Praefke,* and *Losee.* Elliott asserts that none of those three cases involved a joint checking account. In the present case, Elliott

argues, he and Johnnie opened the joint checking account in 1992, more than six years before Johnnie designated Elliott as her POA agent. He argues that Johnnie agreed to deposit all of her income, consisting of monthly social security benefits, City of Milwaukee pension payments, and oil royalties, into the joint account. Elliott asserts that there is no evidence that Johnnie ever attempted or desired to change the flow of her income into the joint account after the execution of the POA document.

¶ 25. Elliott cites *Estates of Beisbier,* 47 Wis. 2d 409, 418, 177 N.W.2d 919 (1970) in support of his argument that a joint checking account is utilized as a "shared wallet," and that a primary consideration behind opening a joint account is to handle living expenses and transfer assets at death by way of survivorship. Elliott argues that he did not engage in self-dealing, and that the intent of both parties was that the income in the joint account should be shared for the use of the family living arrangement. Elliott asserts that he and Johnnie had a shared understanding that Elliott could have unfettered use of the joint account. He argues that the family combined and interchanged their incomes without a need for accounting, and that Johnnie received benefits from the living arrangement, including nursing care, a health care provider, medicine, room and board, clothing, and vacations. Elliott also asserts that Johnnie stated that she wanted to be part of the Russ family, and that the Russes could spend the money she had on the family business.

¶ 26. Elliott argues that this court should not adopt the bright-line rule suggested by Johnnie, because it is too restrictive. He argues that such a rule would hold a POA agent liable for any money spent out of a joint account, in situations where the POA docu-

ment is silent as to gifting or as to use of a preexisting joint account.

¶ 27. He further argues that the POA document had no language requiring him to account for his withdrawals from the joint account, and that he should not be penalized for failing to do so. Finally, Elliott asserts that a joint account opened before the execution of a POA document is different from a joint account opened afterward. He argues that the joint account in this case was opened long before the existence of the POA, and that there is no evidence to suggest anything other than a donative intent.

¶ 28. We agree with Johnnie that a POA agent has a fiduciary duty to the principal, and that the agent is usually prohibited from self-dealing unless the power to self-deal is written in the POA document. *Praefke,* 257 Wis. 2d 637, ¶ 16; *Alexopoulos,* 48 Wis. 2d at 41. However, in this case, the prohibition against self-dealing is complicated by the fact that Elliott and Johnnie opened a joint checking account in 1992, shared the joint account for more than six years before they executed the POA document in 1999, and continued to use the joint account after the execution of the POA document.

¶ 29. Under Wis. Stat. § 705.03, "unless there is clear and convincing evidence of a different intent," the parties to a joint account may withdraw and use the funds in the account without being required to account to any other party to the joint account. In this case, the POA document itself is not clear as to the parties' intent. As the circuit court pointed out in its findings of fact, Johnnie did not check the box on the second page of the POA document that would have required Elliott to provide an accounting, nor did she write instructions for how the joint account should be handled.

¶ 30. Although a POA document creates a fiduciary relationship, the document in this case is silent as to whether Johnnie intended to change the way income flowed into or out of the joint account after the execution of the POA document. One way to avoid future uncertainty about the intentions of parties to a POA would be to have the principal write clearly his or her intentions into the POA document. The Wisconsin Basic Power of Attorney for Finances and Property form has blank lines at the end of the form that could be used for such a purpose.

¶ 31. We hold that, when a POA agent and a principal share a preexisting joint checking account, the execution of a POA document, in and of itself, is not "clear and convincing evidence of a different intent" under Wis. Stat. § 705.03. We are satisfied that § 705.03, under which Elliott owed no duty to Johnnie as a joint account holder, appears to conflict with Elliott's fiduciary duty as a POA agent pursuant to Wis. Stat. § 243.10. This case involves conflicting and inconsistent presumptions.[8] When funds are deposited into a joint bank account, donative intent is presumed. *Derr v. Derr,* 2005 WI App 63, ¶ 36, 280 Wis. 2d 681, 696 N.W.2d 170. The length of time that funds remain in a joint account, along with other evidence, is " 'part of the inquiry into whether the presumption of donative intent is rebutted by other evidence.' " *Id.,* ¶ 36 (citing *Finley v. Finley,* 2002 WI App 44, ¶ 38, 256 Wis. 2d 508, 648 N.W.2d 536).

---

[8] Under Wis. Stat. § 903.01, a presumption "imposes on the party relying on the presumption the burden of proving the basic facts, but once the basic facts are found to exist the presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence."

¶ 32. On the other hand, a fiduciary, such as a POA agent, has an obligation not to engage in self-dealing. In *Zastrow v. Journal Communications, Inc.*, 2006 WI 72, 291 Wis. 2d 426, 718 N.W.2d 51, we stated, "A consistent facet of a fiduciary duty is the constraint on the fiduciary's discretion to act in his own self-interest because by accepting the obligation of a fiduciary he consciously sets another's interests before his own." *Id.*, ¶ 28 (citation omitted). When a POA agent, for the agent's own use, transfers funds deposited by the principal, without written authority in the POA document to do so, a presumption of fraud is created, regardless of whether the funds were deposited before or after the execution of the POA.

¶ 33. Like the present case, *Marine Bank v. Taz's Trucking Inc.*, 2005 WI 65, 281 Wis. 2d 275, 697 N.W.2d 90 involved conflicting and inconsistent presumptions. In that case, the conflicting and inconsistent presumptions concerned consignor and consignee liability for freight charges. This court quoted Professor Daniel D. Blinka in its analysis, stating, " 'Should inconsistent presumptions be established in a case, the weight of the evidence establishing the facts upon which the presumption[s] are premised [the basic facts] is for the trier of fact. . . .' " *Id.*, ¶ 30 (quoting 7 Blinka, *Wisconsin Practice: Wisconsin Evidence*, § 301.4 at 73 n.10 (2d ed. 2001)(citations omitted)).

¶ 34. In *Estate of Rybolt*, 631 N.E.2d 792, 795 (Ill. App. 1994), the Illinois court of appeals[9] stated that "where such conflicting presumptions exist they cancel each other out, leaving the trial court free to make a

---

[9] The present case involves a matter of first impression for which no Wisconsin cases are directly on point. Therefore, we

determination based upon facts and credibility of the witnesses." The court cited *In re Estate of Harms,* 603 N.E.2d 37, 44 (Ill. App. 1992), another Illinois court of appeals case, in which there were joint accounts that existed prior to the fiduciary relationship created by a POA. Income was deposited into the joint account while the fiduciary relationship existed. The court held for the POA agent, reasoning that the deposits made to the accounts followed a procedure that was used prior to the existence of the fiduciary relationship. *Id.* at 45.

¶ 35. Then, in *In re Estate of Teall,* 768 N.E.2d 124 (Ill. App. 2002), the Illinois court of appeals limited the holding in *Harms* to apply only when a joint account was created before the fiduciary relationship began, and where deposits made during the fiduciary relationship followed a procedure that was established before that relationship. The court stated, " '[W]here the attorney-in-fact actively uses his position to create the joint tenancies the presumptions do not cancel; instead, the controlling presumption is the presumption of fraud, which requires strong evidence to overcome.' " *Id.* at 130 (citations omitted).

¶ 36. We adopt the approach of the Illinois court of appeals in *Estate of Rybolt, In re Estate of Harms,* and *In re Estate of Teall.* We hold that a joint checking account established under Wis. Stat. § 705.03 prior to the execution of a POA creates a presumption of donative intent. We further hold that when an agent acting under a POA transfers funds deposited by the principal from such joint account, but for the agent's

---

may look to other jurisdictions for persuasive authority. *See State v. Harvey,* 2006 WI App 26, ¶ 20 n.7, 289 Wis. 2d 222, 710 N.W.2d 482.

own use, a presumption of fraud is created. When these two conflicting and inconsistent presumptions coexist, the circuit court is then free to make a determination based upon the facts and the credibility of the witnesses. *In re Estate of Harms,* 603 N.E.2d at 44. Under such circumstances, as well as in cases where a power of attorney agent actively uses his or her authority to create a joint account with the principal, thereby triggering a presumption of fraud, extrinsic evidence may be admissible to determine the intent of the parties.[10] The prohibition against the admissibility of extrinsic evidence of the parties' intent to allow the making of gifts, as set forth in *Praefke,* 257 Wis. 2d 637, ¶ 20, would not apply in such cases.[11]

■

¶ 37. In arriving at its conclusion that Elliott did not breach his fiduciary duty nor engage in conversion, the circuit court reformed the POA document on grounds of mutual mistake and applied the doctrine of equitable estoppel to bar Johnnie's claim. Although the

---

[10] *See Bronston v. C.I.R.,* 56 T.C.M. (CCH) 550 (1988) (U.S. Tax Court considered surrounding circumstances, in addition to the language of the POA document, in finding that the POA authorized gifts). *See also Estate of Gagliardi v. C.I.R.,* 89 T.C. 1207 (1987) (U.S. Tax Court considered extrinsic evidence in determining that the POA was broad enough to authorize the making of gifts on behalf of the decedent).

[11] In *Praefke v. American Enterprise Life Insurance Company,* 2002 WI App 235, ¶ 20, 257 Wis. 2d 637, 655 N.W.2d 456, the court of appeals stated:

> [W]e hold that an attorney-in-fact may not make gratuitous transfers of a principal's assets unless the power of attorney from which his or her authority is derived expressly and unambiguously grants the authority to do so. As a corollary to this bright-line rule, extrinsic evidence of the principal's intent to allow such gifts is not admissible.

circuit court applied the doctrines of reformation and equitable estoppel, we decline to take that approach here because such approach, if followed by other circuit courts, would likely be very time consuming. Those doctrines are often difficult to apply, especially in cases such as the one presented here. The equitable remedy of reformation requires a showing that the instrument fails to express the intent of the parties, either because of the mutual mistake of both parties, or because of the mistake of one party coupled with fraud or inequitable conduct of the other party. *Henning v. Ahern*, 230 Wis. 2d 149, 174, 601 N.W.2d 14 (1999). The elements for equitable estoppel include (1) an action or non-action that induces (2) reliance by another, either in the form of action or non-action, (3) to his or her detriment. *Randy A.J. v. Norma I.J.*, 2004 WI 41, ¶ 26, 270 Wis. 2d 384, 677 N.W.2d 630. We are satisfied that the conflicting presumptions approach taken by Illinois courts, and adopted here, will be more efficient and less time consuming than the multistep process of utilizing reformation and equitable estoppel. We also decline to adopt a bright-line rule, as suggested by Johnnie. We recognize that joint accounts are tools that can be useful for a POA agent and principal in carrying out the practical duties of daily life.

■■■

¶ 38. In its findings of fact, the circuit court noted numerous facts that were essential to its dismissal of Johnnie's complaint. We will not set aside a circuit court's findings of fact unless they are clearly erroneous. *See* Wis. Stat. § 805.17(2). Some of the most significant findings of fact include the following:

> 19. There is no dispute that the power of attorney contract is blank when it comes to the requirement to provide an accounting.

. . . .

22. Plaintiff, defendant, and Doris Russ lived together as three adults living a comfortable life. The arrangement was that everything defendant and Doris Russ had was plaintiff's and everything plaintiff had was defendant's and Doris Russ' as a family and commingled income and expenses.

23. A paid caretaker was present almost daily for many years, at the direction of Doris Russ and defendant, in addition to the care given by Doris Russ, Leea Power, formerly a home health assistant, and defendant.

. . . .

28. The understanding and deal between the parties . . . that is consistent with everybody's testimony and the actions for many years both before and after the power of attorney was signed is that plaintiff and everyone concerned understood that defendant was taking care of plaintiff because she was his mother and defendant could do what he pleased with her money.

29. The understanding between plaintiff, defendant and probably Doris Russ was that there was not to be a dispute, there was to be no litigation over expenditures of money and clearly an intent that such litigation should never happen.

. . . .

32. Plaintiff gave defendant broad discretion over the seven years prior to the signing of the power of attorney to use the joint account in any manner without objection and the parties intended that to continue after the signing of the power of attorney.

33. Plaintiff wilfully [sic] and voluntarily agreed to live with defendant and Doris Russ and plaintiff relied upon their willingness to take care of her, provide housing,

food, clothing, vacations, health care and other personal needs and in exchange defendant and plaintiff created a joint account and there was freewheeling use of that account for many years. After the signing of the power of attorney defendant chose willingly and voluntarily to continue this relationship the same as before.

. . . .

35. Plaintiff placed no restrictions upon the joint account and entitled defendant to use it freely and without restriction.

36. The parties were not represented by any attorney(s) with regard to the drafting or signing of the power of attorney.

¶ 39. These findings of fact are supported by the record and are not clearly erroneous. The circuit court's findings provide a sufficient basis for its conclusion that Elliott did not breach his fiduciary duty. Here we adopt and use the conflicting and inconsistent presumptions approach, rather than the doctrines of reformation and equitable estoppel, in reaching our holding that the decision of the circuit court should be affirmed.[12]

## IV

¶ 40. We hold that a joint checking account established under Wis. Stat. § 705.03 prior to the execution of a POA creates a presumption of donative intent, and that the transfer of funds from such a joint account by an agent acting under a POA, but for the agent's own use, creates a presumption of fraud, unless the POA explicitly authorizes self-dealing. We further hold that

---

[12] Future problems can be avoided if parties include clear language of intent within the POA document.

when, as in the present case, these two conflicting and inconsistent presumptions coincide, the circuit court is free to make a determination based on the facts and the credibility of the witnesses, as the circuit court did here. We are also satisfied that, while the circuit court here reformed the POA document on the basis of mutual mistake, and held that equitable estoppel barred Johnnie's claim, that such an approach should not be undertaken in future cases. Rather, a circuit court should decide conflicts between Wis. Stat. § 705.03 and the fiduciary duties imposed by a POA executed under Wis. Stat. § 243.10, in the manner discussed herein.

*By the Court.*—The order of the circuit court is affirmed.

¶ 41. SHIRLEY S. ABRAHAMSON, C.J. (*concurrence*). I join the majority opinion but write to put this case in the larger societal and legal context of elder abuse generally and durable powers of attorney and joint accounts more specifically.[1]

---

[1] I have consulted and relied on the following articles in writing this concurrence but, at points, have avoided citing one or more of these resources for some of the ideas set forth herein. These scholarly commentaries have proven to be insightful and those interested in further discussion should turn to them. *See* Carolyn L. Dessin, *Financial Abuse of the Elderly: Is the Solution a Problem,* 34 McGeorge L. Rev. 267 (2003) [hereinafter Dessin, *Financial Abuse*]; Nina A. Kohn, *Elderly Empowerment as a Strategy for Curbing the Hidden Abuses of Durable Powers of Attorney,* 59 Rutgers L. Rev. 1 (2006); Hans A. Lapping, *License to Steal: Implied Gift-Giving Authority and Powers of Attorney,* 4 Elder L. J. 143 (1996); Karen E. Boxx, *The Durable Powers of Attorney's Place in the Family of Fiduciary Relationships,* 36 Ga. L. Rev. 1 (2001); Carolyn L. Dessin, *Acting as Agent under a Financial Durable Power of Attorney: An Unscripted Role,* 75 Neb. L. Rev. 574 (1996) [hereinafter Dessin, *Acting as Agent*];

¶ 42. With the aging of our population has come an increasing interest in the legal problems of older Americans and an increasing awareness of the exploitation of the elderly. The present case should raise concerns about the specter of financial exploitation.

¶ 43. Traditionally the judicial system has provided protection for an incompetent and has reviewed the activities of a representative to ensure that the incompetent is not exploited. An incompetent may have no one to protect him or her other than the courts. Courts should be cognizant of this traditional function in resolving cases involving durable powers of attorney.

¶ 44. The durable power of attorney is a statutory creature derived from the common law nondurable power of attorney.[2] A durable power of attorney, unlike the common law power of attorney, survives the principal's disability or incapacity. In fact, "[d]urable powers of attorney are intended to give competent individuals the ability to delegate to an agent broad powers to manage their affairs and assets in the event of incompetency."[3] The durable power is a very useful tool for many persons and for many circumstances. The durable power enhances the autonomy of the principal by enabling a principal to make decisions for himself or

William M. McGovern, Jr., *Trusts, Custodianships, and Durable Powers of Attorney,* 27 Real Prop. Prob. & Tr. J. 1 (1992–93).

[2] Wis. Stat. §§ 243.07–243.10. *See also* Uniform Durable Power of Attorney Act, 8A U.L.A. 275 (2003).

[3] *Knight v. Milwaukee County,* 2002 WI 27, ¶ 27, 251 Wis. 2d 10, 640 N.W.2d 773 (internal citations omitted) (also explaining that "the agent under a durable power of attorney has been characterized as the 'alter ego' of the principal").

herself while competent that will continue to be effective if the principal becomes incompetent.[4]

¶ 45. The durable power of attorney can improve the living conditions of the elderly and provide security for their future care.[5] A durable power of attorney can help a competent principal to handle his or her financial and legal affairs and living arrangements and can then enable the attorney-in-fact, the agent, to handle the principal's finances and day-to-day quality of life without having to declare the principal incompetent and without having to seek court supervision. These durable powers are drafted to enable the agent to handle a range of matters, including enabling the agent to do everything that the principal could individually do.

¶ 46. As the population ages and as the value of these durable powers of attorney are becoming better known, lawyers and nonlawyers are drafting these durable powers more frequently. A study by the AARP in 2000 found that 45% of Americans age 50 or older reported having executed a durable power of attorney, representing a large increase in the prevalence of durable powers from a decade earlier.[6]

---

[4] The drafters of the Uniform Durable Power of Attorney Act explained its purpose as "to assist persons interested in establishing non-court regimes for the management of their affairs in the event of later incompetence or disability." *See Knight,* 251 Wis. 2d 10, ¶ 29.

[5] The durable power of attorney is not intended only for the benefit of the elderly. It is a useful planning tool for persons of all ages; disability and incapacity unfortunately can happen to anyone at any age.

[6] Nina A. Kohn, *Elderly Empowerment as a Strategy for Curbing the Hidden Abuses of Durable Powers of Attorney,* 59 Rutgers L. Rev. 1 (2006) (citations omitted).

¶ 47. The durable power of attorney has been appropriately characterized as "a simple yet powerful tool."[7] But it is at the same time a troublesome document, creating the potential for abuse. By merely signing a durable power of attorney, a principal may give an agent tremendous power, including the power to sell the principal's home and any other assets, to make investments, to cancel insurance policies or name new beneficiaries, and even to empty the bank accounts.

¶ 48. A 1993 national survey of attorneys, social service providers, area aging administrators, district attorneys, and surrogate court judges conducted by the Government Law Center of Albany Law School found that 94% of those surveyed reported having personal knowledge of abuse of a power of attorney. Sixteen percent of those surveyed had encountered abuse 6 to 10 times, and 22 percent had encountered such abuse 10 or more times.[8] Most of the litigation involving durable powers of attorney seems to arise when an agent allegedly makes improper gifts or engages in more broadly-stated "self-dealing."[9]

¶ 49. Yet the problems involving durable powers of attorney do not arise just from the acts of selfish and conniving agents. Commentators have also expressed concern about the difficulties created by the confusing nature of the fiduciary duty imposed by a durable

---

[7] Lapping, *supra* note 1, at 167.

[8] *Id.* at 167–68 (citation omitted). Professor Boxx, however, states that abuse of the durable power document is rare. Boxx, *supra* note 1, at 2 (citation omitted). For discussions of the incidence of financial exploitation of the elderly, see, *e.g.*, McGovern, *supra* note 1, at 13; Dessin, *Acting as Agent, supra* note 1, at 575–76, 584; Dessin, *Financial Abuse, supra* note 1, at 280–81.

[9] Dessin, *Acting as Agent, supra* note 1, at 612–14 (1996).

power. As one commentator aptly summarized, "[t]he most serious problem with durable powers is the uncertainty as to the agent's powers."[10] Little guidance is given to agents in the statutes or case law, and few guidelines have been clearly established as to the standard agents are to use in making decisions for the principal under the durable power and the extent of their duty to communicate with the principal.

¶ 50. So how is a well-intentioned agent supposed to behave? Assumptions have been made that an agent under a durable power is governed by traditional agency rules, or by rules analogous to those governing guardians and trustees, or by general fiduciary principles.[11] Merely to say that the principal is a fiduciary, however, is not sufficient. Many different types of fiduciary relationships exist, and the obligations of the agent vary depending on the specific context of the fiduciary relationship.[12]

¶ 51. Problems are also specifically posed by the "durable" nature of the durable power of attorney.

---

[10] McGovern, *supra* note 1, at 32. *See also* Boxx, *supra* note 1, at 42 (agent's predicament is to carry out "unscripted" duties in "confusing climate of amorphous fiduciary principles and the even less-defined role of an attorney-in-fact").

[11] Dessin, *Acting as Agent, supra* note 1, at 584–85.

The Restatement (Third) of Agency explains that

The relationship created by a durable power resembles agency because it is a mechanism to enable the legal consequences of one person's acts to be attributed to another person. In other respects, the relationship at this point resembles a trust in which the power holder is similar to a trustee because the person acting is not under the control of the person for whom the actor's conduct has consequences and on whose behalf the actor has a duty to act.

1 Restatement (Third) Agency, Introduction, at 10 (2006).

[12] Kohn, *supra* note 1, at 13 (citations omitted).

Perhaps when a principal is competent and is aware of the agent's actions one set of fiduciary duties comes into play under a durable power, but a different set of fiduciary duties may govern after the principal becomes incompetent. Having different standards, however, may prove not only difficult but may also be contrary to the goals of the durable power of attorney. The determination of incompetency is complicated and the durable power of attorney is designed to avoid a judicial declaration of incompetency.[13]

¶ 52. State statutes on durable powers use multiple standards for the agent's decision-making, including fiduciary standards, due care, what the agent finds "desirable or necessary," what the agent finds "useful, necessary or . . . reasonable," or what the agent believes is "in the best interests of the principal."[14] Wisconsin's statute plainly requires that the agent perform his or her duties "in accordance with the terms of the durable power of attorney executed by the principal." Wis. Stat. § 243.07(6r)(a), (6r)(a)1.

¶ 53. The majority opinion adopts the "intention of the principal" as the standard for testing the agent's decision-making in the present case. An agent is to act according to the principal's wishes. Such a standard may be fine when the principal can supervise the agent. This standard, however, may be subject to abuse when the principal can no longer supervise the agent and cannot testify because he or she is incompetent or deceased.

---

[13] Boxx, *supra* note 1, at 42–43, 50–51; Dessin, *Acting as Agent, supra* note 1, at 607–08, 610.

[14] Kohn, *supra* note 1, at 13–15 (citations omitted); Boxx, *supra* note 1, at 47–48.

¶ 54. Moreover, this standard may become problematic when the principal's wishes are at odds with the principal's best interests. The principal, for instance, may not want to move into an assisted living facility even though he or she can no longer live alone, or may not want to sell certain assets even though he or she is financially strapped. What is the well-intentioned agent to do, when what is clearly in the principal's best interests is against the principal's intentions?

¶ 55. The lack of clarity of the agent's duties allows greater flexibility in an agent's decision-making process. Yet the lack of clarity may also open the durable power to exploitation and may make it difficult for a court to remedy any misuse of the power, even though courts traditionally have protected the incompetent.

¶ 56. Various proposals have been suggested that aim to help the principal maintain autonomy, to curb abuse of the durable power, and to retain the advantages of the document. As the durable power of attorney is also used in other common law countries, this area of law may be one in which we can learn from the experiences of other countries, especially England, Australia, and New Zealand.[15]

¶ 57. Among the proposals for reform of the durable power, one commentator suggests that the agent be required to communicate with the principal and provide advance notification of major transactions.[16] Other suggested reforms include requiring more robust practices in the execution of the durable power; focusing on an agent's limited ability to engage in certain

---

[15] Kohn, *supra* note 1, at 21–22 (citations omitted); McGovern, *supra* note 1, at 37–38.

[16] Kohn, *supra* note 1 (passim).

suspect transactions like gift-giving and self-dealing; appointing a third party to monitor or otherwise increase the ability of third parties to police the durable power of attorney relationship; requiring the agent to register with the court system and provide periodic accountings to the court if and when the principal becomes incompetent; requiring the agent to be bonded; and clarifying the agent's role and reining in the agent's autonomy in order to create a system consistent with traditional agency principles. Levy enhanced civil and criminal penalties on abusers of the durable power.[17]

¶ 58. State legislatures have started paying attention to these and other concerns. A study conducted by the American Bar Association's Commission on Law and Aging found that in the years 2000–2003, 28 states had engaged in legislative activity relating to durable power of attorney instruments.[18]

¶ 59. This case illustrates the complexity of the problem and how simple reforms may not work. In the instant case, the principal was an elderly woman who, without benefit of counsel, appointed her adult son as the agent under a standard durable power of attorney form and who later became incompetent. In completing the durable power form, the mother did not explicitly allow her son to make gifts or engage in self-dealing. Nevertheless, because of the circumstances and rela-

---

[17] *Id.* at 33–36 (citations omitted); Dessin, *Financial Abuse, supra* note 1, at 280–320 (discussing various statutory attempts to address, remedy and punish financial abuse of the elderly); Boxx, *supra* note 1, at 44–48, 55 (discussing statutory attempts to address the lack of supervision of agents and to define agents' duties).

[18] Kohn, *supra* note 1, at 33.

tionship, the circuit court (and this court) treat the power of attorney as if it had these provisions.

¶ 60. Further complicating the agency relationship in the present case is that the mother and son had a joint account that predated the execution of the durable power. The joint account contained only the mother's funds but was used before the execution of the durable power for both the mother's and the son's personal needs. The mother's funds continued to be put into the joint account after the durable power was executed and continued to be used for both the mother's and the son's personal needs.

¶ 61. Joint accounts can serve many purposes and take several forms, although the title "joint account" is the same. *See* Wis. Stat. §§ 705.01(4), 705.02(1). Sometimes only one person knows of or uses the joint account; the account is actually a testamentary device. With other joint accounts, both persons access the account for whatever purposes they wish. Still other joint accounts are accounts of convenience; the funds belong to the depositor of the funds and the other person accesses the account for the benefit of the owner of the funds, such as to pay the owner's bills.

¶ 62. Cases have arisen concerning whether the incompetency of one of the joint tenants terminates the joint account.[19] As the majority opinion makes clear, the present case concerns the intersection of the rules

---

[19] For discussions of jointly held bank accounts, see Robert D. Williams, Note, *When Is Separate Property, Which is Placed into a Jointly Held Bank Account, Transmuted? The Approach Taken in Wisconsin: Lloyd v. Lloyd, 487 N.W.2d 647 (Wis. Ct. App. 1992), review denied, 494 N.W.2d 210 (Wis. 1992),* 29 Idaho L. Rev. 1060 (1992–93) (relating to marital property); Bruno W. Tabis, Jr., Note, *Illinois Conservator's Right to Invade Joint Savings Account,* 48 Chi.-Kent L. Rev. 230 (1971); William J.

governing durable powers of attorney and the rules governing joint accounts. This case illustrates that the durable power of attorney implicates other areas of the law, and any reform must be mindful of these other legal issues.

¶ 63. The circuit court considered all the evidence and concluded that the son's use of the joint account was authorized by the mother despite the text of the durable power of attorney. This court reviewing the findings of the circuit court concludes that the son's use of the joint account comports with the mother's intention. I join the majority opinion in the present case but conclude that a court must approach a case involving an incompetent with the "presumption" that a primary function of the court is to protect the incompetent.

¶ 64. There are significant issues bubbling and brewing just below the surface of today's decision that need to be addressed. Courts have not had the opportunity to define the role of an agent under a durable power of attorney sufficiently because litigation is too infrequent and too fact-specific. Legislative study of the use and abuse of durable powers of attorney may be called for. *See* Wis. Stat. § 13.83(1) (Law Revision Committee). The legislature should consider formulating guideposts to govern the fiduciary responsibilities of an agent so that agents can operate efficiently on behalf of the principal under a durable power, while the principal is protected from abuse of the power and unnecessary court interventions and government intrusions are prevented. Any reform of the durable power of attorney must preserve and foster the instrument's usefulness.

¶ 65. For the reasons set forth, I write separately.

Rohrbach, Jr., Note, *Contracts—Incompetency and the Joint and Survivorship Bank Account,* 24 Baylor L. Rev. 397 (1972).

¶ 66. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.