In the

# United States Court of Appeals

### For the Seventh Circuit

––––––––––––

No. 07-1948

ST. PAUL MERCURY INSURANCE COMPANY,

*Plaintiff-Appellant*,

*v.*

THE VIKING CORPORATION,

*Defendant-Appellee*.

––––––––––––

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 04 C 1124—**William E. Callahan, Jr.**, *Magistrate Judge*.

––––––––––––

ARGUED NOVEMBER 9, 2007—DECIDED AUGUST 21, 2008

––––––––––––

Before BAUER, MANION, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. St. Paul Mercury Insurance Company sued The Viking Corporation, a fire sprinkler manufacturer, for breach of warranty over an allegedly defective sprinkler that damaged a building owned by St. Paul's insured, Johnson Bank. Because there was no agreement between Johnson Bank and Viking when the sprinkler was purchased, privity of contract did not exist,

so we conclude that the magistrate judge properly granted summary judgment in favor of Viking.

## I. BACKGROUND

On October 25, 2002, a fire sprinkler manufactured by Viking became activated at the Johnson Bank Building in Racine, Wisconsin. This was not supposed to happen, since there was no fire. The water did not stop gushing until the fire department arrived to shut down the system, and by then, the water had seriously damaged the bank.

At the time of the incident, Johnson Bank had occupied the newly-built building for only about six months. It had contracted with M.A. Mortenson Co. to build the bank; this contract had a one-year warranty effective until May 2003. Mortenson in turn subcontracted with Wenninger Company to install a fire suppression system, including fire sprinklers, which was also under a one-year warranty effective until May 2003.

As a subcontractor, Wenninger bought the sprinklers for the fire suppression system from Viking. This sprinkler contract included a one-year warranty for replacement of defective sprinkler heads, though this warranty was explicitly limited to the original purchaser, Wenninger. There is no evidence that Johnson Bank ever received any warranty information, advertising, or other literature from Viking regarding the sprinklers prior to the accident.

After the accident, Johnson Bank's insurer, St. Paul Mercury Insurance Company, reimbursed Johnson Bank fully for the water damage. St. Paul then asked an engi-

neer, John Mertens, to examine the sprinkler head. After eliminating many potential causes, Mertens and St. Paul concluded that a defective glass bulb in the sprinkler most likely caused the sprinkler to activate.[1] Mertens could not eliminate improper installation or handling as possible causes.

Viking's Manager of Technical Services, George Wirsch, also inspected the sprinkler. According to Wirsch (who had inspected hundreds of activated sprinklers in his twenty-five years of experience), a sprinkler head will activate for only one of four reasons: (1) heat, (2) mechanical trauma, (3) ice in the line, or (4) defects in the workmanship or materials for the sprinkler head. Although Wirsch could not determine what had caused the sprinkler to activate, he claimed not to see any evidence of improper installation or mechanical trauma, and could not eliminate defects in workmanship or materials as possible causes.

Viking also asked another individual, Professor John Gland, to inspect the sprinkler. Dr. Gland has a Ph.D. in physical chemistry and twelve years of experience conducting microscopic analysis of materials in the private sector. Although he did not have a background in fire protection systems, he had worked on three other sprinkler activation cases. As part of his analysis, Dr. Gland exam-

---

[1] When inactive, the glass bulb fit together with a screw to block water that was in a connected pipe. The bulb contained a temperature-sensitive liquid, which was designed to expand and cause the bulb to burst when the ambient temperature rose above a certain level. This would then permit the water to flow out and douse the heat source.

ined the sprinkler under a microscope and compared it to an exemplar sprinkler. Based on this comparison, Dr. Gland concluded there was no evidence that the subject sprinkler was defective. Dr. Gland also saw foreign fibers and "witness marks" near where the glass bulb had been, which suggested to him that someone had applied force or removed the sprinkler after it had been installed. He could not eliminate the glass bulb as the cause of activation, given that the bulb had shattered and was missing.

On September 30, 2004, St. Paul stepped into Johnson Bank's shoes via subrogation and filed a four-count complaint, including a claim for breach of warranty, against Viking in Wisconsin state court. Viking removed the case to federal court on diversity grounds and the parties agreed to proceed before a magistrate judge. Viking then moved for summary judgment, which the magistrate judge granted, concluding that a lack of privity between Viking and Johnson Bank barred St. Paul's breach of warranty claim. The parties also filed cross-motions to exclude their adversaries' expert witnesses, but in light of the summary judgment grant, these motions were denied as moot.

St. Paul now appeals the grant of summary judgment on its breach of warranty claim.[2] It also appeals the magistrate judge's denial of its motion to exclude the expert testimony of Viking's expert, Dr. Gland.

---

[2] St. Paul also raised tort claims for negligence and strict liability, and a false advertising claim under the Wisconsin Deceptive Trade Practices Act, but it has abandoned these claims on appeal.

## II.  ANALYSIS

### A.   A lack of privity between Johnson Bank and Viking bars St. Paul's breach of warranty claim.

Both St. Paul and Viking agree that "Wisconsin law requires privity of contract between the parties before liability can be founded on breach of express or implied warranty." *Twin Disc, Inc. v. Big Bud Tractor*, 582 F. Supp. 208, 215 (E.D. Wis. 1984) (citing *Paulson v. Olson Implement Co.*, 319 N.W.2d 855 (Wis. 1982)). The magistrate judge found that privity was lacking here because Viking's warranty was limited to the original purchaser (Wenninger), and did not encompass Johnson Bank or, by extension, its subrogee St. Paul. St. Paul challenges this finding on the grounds that we discuss below.

### 1.   There was no agency relationship between Johnson Bank and Wenninger that would establish privity between Johnson Bank and Viking.

St. Paul first argues that privity exists between Johnson Bank and Viking because Wenninger acted as Johnson Bank's agent when Wenninger bought the sprinklers from Viking. To establish agency under Wisconsin law, a principal must: (1) manifest an express or implied intent to have another party act for him, (2) retain the right to control the details of the other party's work, and (3) operate in a distinct occupation or business from the other party. *See James W. Thomas Constr. Co. v. Madison*, 255 N.W.2d 551, 554 (Wis. 1977); *Peabody Seating Co. v. Jim Cullen, Inc.*, 201 N.W.2d 546, 549 (Wis. 1972). Here, the record does not suggest that either of the first two require-

ments was met. The parties agree there is no evidence of any agreement or any pre-accident contact between Johnson Bank and Wenninger, let alone an arrangement that would suggest the existence of an agency relationship. St. Paul concedes that Johnson Bank did not even know Viking sprinklers were installed until after the accidental activation, and Johnson Bank's corporate representative testified that Johnson Bank never saw any warranty or written materials from Viking before installation.

St. Paul makes much of the fact that Johnson Bank eventually paid for the sprinklers, but presumably it paid Mortenson (the general contractor) not Wenninger (the subcontractor). At any rate, St. Paul does not explain how this payment, without more, created an agency relationship. Indeed, accepting St. Paul's argument would essentially allow any homeowner to sue a subcontractor on a warranty claim, even though no contract exists between them. Such an approach would be inconsistent with existing Wisconsin law. *See, e.g.*, *Linden v. Cascade Stone Co.*, 699 N.W.2d 189, 199 (Wis. 2005) ("[H]omeowners retain contractual remedies against the general contractors, who in turn have their own remedies against the subcontractors.").

St. Paul twists this argument a bit and notes that Wis. Stat. § 779.01 gives a subcontractor a lien on the property on which the subcontractor works. St. Paul reasons that this lien shows that Johnson Bank was the real party purchasing the Viking sprinkler heads. This argument does not make sense. Whether a statute creates a lien by operation of law to protect a subcontractor's rights has no bearing on whether the landowner (Johnson Bank) is in

privity of contract with a manufacturer (Viking) whose product is being used by the subcontractor (Wenninger). *See Hunzinger Constr. Co. v. SCS of Wis., Inc.*, 694 N.W.2d 487, 490 (Wis. Ct. App. 2005) *(*"A general purpose of [the construction lien] laws is to ensure the payment of construction project subcontractors and material suppliers."); *see also id.* at 491 ("[A] construction lien is a matter in rem and not in personam. Absent a contractual relationship between the lienor and the property owner, a personal judgment against the property owner cannot be maintained.").

On the second prong of the agency test, St. Paul suggests that the magistrate judge confused Johnson Bank's admitted decision not to control the details of Wenninger's work with Johnson Bank's right to control those details. But St. Paul does not explain how Johnson Bank retained a "right to control" Wenninger's work—for example, St. Paul does not cite to any provision of the Mortenson contract showing that Johnson Bank had the right to override a subcontractor's choice of materials. St. Paul persists that Johnson Bank told Mortenson only to use high quality products that have a warranty. But at best this shows that Johnson Bank had some control over Mortenson; it does not show that Johnson Bank had any control over *Wenninger*, who actually bought the sprinklers and was covered under Viking's warranty.

St. Paul also maintains the existence of an agency relationship is a factual question that should be left to a jury. But as we have seen, there is no evidence in the record to suggest that Wenninger acted as Johnson Bank's agent. So

there is no genuine factual dispute on this issue and no reason for it to proceed to a jury. *See, e.g.*, *Beer Capitol Distrib. v. Guinness Bass Imp. Co.*, 290 F.3d 877, 879 (7th Cir. 2002).

### 2. There is no equitable basis to find privity here.

St. Paul also raises what appears to be an estoppel argument, claiming that Viking acted as if St. Paul were covered by the warranty policy by sending St. Paul letters denying liability. St. Paul does not cite (and there does not appear to be) any Wisconsin case law discussing whether privity of contract can be established by estoppel. Indeed, we doubt whether estoppel even makes sense here, given that there was no relationship (contractual or otherwise) between Viking and Johnson Bank when the sprinklers were purchased and no good reason for St. Paul to believe that Viking's warranty extended to Johnson Bank. But even if estoppel could apply here, St. Paul has not shown why it should apply, as St. Paul has not demonstrated any detriment that it incurred because of Viking's alleged actions toward it. *See Russ v. Russ*, 734 N.W.2d 874, 885 (Wis. 2007) ("The elements for equitable estoppel include (1) an action or non-action that induces (2) reliance by another, either in the form of action or non-action, (3) *to his or her detriment*." (emphasis added)).

### 3. The privity requirement for warranty claims still exists under Wisconsin law.

Finally, St. Paul claims that Wisconsin law is evolving toward eliminating the privity requirement for remote

purchasers of products. St. Paul believes this requirement is unfair and outmoded, and may leave remote users without a remedy given Wisconsin's recent expansion of the economic loss doctrine, which bars tort claims sounding in contract. *See Daanen & Janssen v. Cedarapids, Inc.*, 216 Wis. 2d 395, 397 (1998). St. Paul also notes that other states have eliminated similar privity requirements. *See, e.g., Spring Motors Distrib., Inc. v. Ford Motor Co.*, 489 A.2d 660, 676 (N.J. 1985).

Whether fair or not, the most recent pronouncement by the Wisconsin Supreme Court on this issue suggests that privity of contract still applies for warranty claims like the one here, even if there is no corresponding tort claim. *See Daanen*, 216 Wis. 2d at 402 (economic loss doctrine bars tort claims even when there is no privity of contract). We decline St. Paul's invitation to step ahead of our colleagues on the Wisconsin courts to change the status quo. *See Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1093 (7th Cir. 1999) ("Lacking any inherent power to make state law such as a state court might have . . . a federal court must be careful to avoid the temptation to impose upon a state what it, or other jurisdictions, might consider to be wise policy."). It is far from clear that the privity requirement leads us to an "unfair" outcome here, as St. Paul could have avoided its troubles simply by suing the general contractor, Mortenson, with whom Johnson Bank had contracted.

**B. The magistrate judge did not abuse his discretion in allowing Viking's expert to testify.**

Because St. Paul's breach of warranty claim against Viking is barred as a matter of law, we merely note in passing that we also reject St. Paul's alternate argument that the magistrate judge abused his discretion in allowing Viking's witness, Dr. John Gland, to testify as an expert. Dr. Gland's extensive experience in microscopy was certainly relevant to his testimony that wear and tear on the sprinkler suggested the possibility of tampering. And there was nothing problematic about Dr. Gland's use of process of elimination in reaching this conclusion. *See Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000) ("In order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury. The fact that several possible causes might remain 'uneliminated' only goes to the accuracy of the conclusion, not to the soundness of the methodology." (internal quotation marks, omission, and citation omitted)). Moreover, while some of the foreign fibers that Dr. Gland observed might have been visible to the naked eye (and hence, as St. Paul notes, visible to jurors), that doesn't necessarily mean there was no need for an expert. Indeed, the significance of the fibers might not have been clear absent expert testimony, especially since St. Paul's expert did not identify the fibers in his report.

### III.  CONCLUSION

The judgment is AFFIRMED.