**COURT OF APPEALS
DECISION
DATED AND FILED**

**November 25, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP1890**

Cir. Ct. No. **2018CV110**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

TIM J. FRUIT AND JILL A. MARIN,

PLAINTIFFS-APPELLANTS,

V.

BONNIE J. FRUIT,

DEFENDANT-RESPONDENT.

APPEAL from an order of the circuit court for Grant County: CRAIG R. DAY, Judge. *Reversed and cause remanded*.

Before Fitzpatrick, P.J., Kloppenburg, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Siblings Tim Fruit and Jill Marin appeal a summary judgment in favor of their step-mother, Bonnie Fruit. Gerald Fruit, now

deceased, was the father of Tim and Jill from a prior marriage.[1] Tim and Jill contend that lawsuit settlement proceeds for personal injuries Gerald sustained are part of Gerald's probate estate and should be distributed to them pursuant to the terms of Gerald's will.[2] Those settlement proceeds were not part of Gerald's probate estate because, in the four months between payment of the settlement proceeds and Gerald's death, Bonnie, while acting as Gerald's attorney-in-fact under a durable power of attorney ("POA"), deposited the vast majority of the settlement proceeds into a money market account in which she had the survivorship interest upon Gerald's death and certificates of deposit held either in her name alone or jointly with Gerald. We will generally refer to that account and the certificates of deposits ("CDs") collectively as "the disputed accounts." As a result, upon Gerald's death, the funds in the disputed accounts passed solely to Bonnie outside of probate.

¶2    In a motion for summary judgment, Bonnie argued, and the circuit court agreed, that she had the authority as Gerald's attorney-in-fact to deposit the settlement proceeds in the disputed accounts. The court also denied Tim and Jill's motion for partial summary judgment in which they argued that Bonnie breached her fiduciary duty to Gerald. We reverse the orders of the circuit court, grant partial summary judgment to Tim and Jill on some issues, conclude that there are genuine issues of fact on other issues, and remand for further proceedings consistent with this opinion.

---

[1] Because many of the persons involved in this case share the same last name, we will refer to each by their first name.

[2] We will generally refer to the net amount received from that lawsuit as the "settlement proceeds."

## BACKGROUND

¶3    For purposes of summary judgment, we conclude that there is no dispute regarding the following material facts, unless otherwise noted.

¶4    Bonnie was married to Gerald from 1992 until Gerald's death in December 2016.  Gerald had two children from a prior marriage, Tim and Jill.

¶5    In February 2009, Gerald executed his last will and testament.  In his will, Gerald named Tim to be his personal representative.  Gerald left all probate assets to Tim and Jill in equal shares.  The will also stated:  "Because Bonnie and I have maintained the assets we brought into our marriage as individual property of each of us and have planned to have such assets distributed to our respective families, she is hereby excluded from receiving any distribution from the residue of my estate."  Tim, Jill, and Bonnie knew the contents of Gerald's will.

¶6    At the time he executed his will, and until his death, Gerald was the sole owner of a money market account at American Bank & Trust (the "money market account").  One week before Gerald executed his will in 2009, Bonnie was designated by Gerald as the payable on death ("POD") beneficiary for the money market account.

¶7    In an affidavit filed in this action, Gerald's attorney who drafted the will alleged that, at the time Gerald executed his will, Gerald "understood which assets would pass outside of probate and which assets would be distributed through his Estate plan."[3]

---

[3] In her respondent's brief, Bonnie asserts that, at the time of Gerald's death and except for one Edward Jones account, all of Gerald's accounts were payable on death, transferrable on

(continued)

¶8      In January 2013, Gerald was injured during a medical procedure. After that, Gerald mostly lived in nursing homes.  Gerald, Bonnie, Tim, and Jill were named as plaintiffs in a lawsuit against Gerald's doctor who performed the procedure.  That medical malpractice lawsuit was brought in federal court in Iowa, apparently because the procedure took place in Iowa.

¶9      In September 2014, Gerald executed a POA naming Bonnie as his attorney-in-fact for financial matters with Tim as the alternate agent.[4]  Specific provisions of the POA are set forth later in this opinion.

¶10     On August 25, 2016, the parties to the medical malpractice lawsuit reached an agreement in which Gerald, Bonnie, Tim, and Jill agreed to release Gerald's doctor from all claims in exchange for payment of a specified amount.[5]

---

death, or jointly owned with Bonnie.  However, the cites to the record given by Bonnie do not support the assertion about the Edward Jones account.

We also note that Bonnie's brief has a reference to a respondent's appendix.  However, Bonnie, as the respondent, did not file an appendix in this court.

[4] We observe that there is no statement under oath in the record which would support an assertion that Gerald's POA found in the record is a complete and authentic copy of that instrument.  Gerald's POA was drafted by the attorney who represented Bonnie in the circuit court and represents Bonnie in this court.  That attorney's motion for summary judgment filed in the circuit court attached Gerald's POA to the motion without an affidavit.  A portion of a response to a request for production of documents in the record mentions Gerald's POA, but that pleading does not have Gerald's POA attached to it.  Nonetheless, the briefing in this court from Tim and Jill does not dispute that the copy of Gerald's POA in the record is authentic.

In addition, Tim and Jill do not point to any evidence in the summary judgment record that Gerald lacked capacity to execute the POA or that his execution of the POA was the result of undue influence by Bonnie.  Nor have Tim and Jill asked that the POA be declared invalid.

[5] As part of that settlement agreement, the parties agreed to keep the terms confidential. The terms of the settlement, including the total settlement amount, were sealed by order of the circuit court.  The amounts of that settlement distributed to, or by, the parties to this action mentioned in this opinion do not implicate the confidentiality terms of the settlement agreement.

Pertinent to this appeal, Bonnie, Tim, Jill, and Gerald (with Bonnie signing for Gerald) signed a Release and Indemnity Agreement in which they agreed that a specified portion of the settlement amount would be paid to Medicare, and the balance of the settlement amount would be paid by a check made out to "Gerald and Bonnie Fruit" and their attorney. Also on August 25, 2016, after attorney fees and costs were deducted, the settlement proceeds were disbursed in a check made out to "Gerald and Bonnie Fruit" in the amount of $553,524.63.[6]

¶11 While acting as Gerald's POA, Bonnie distributed the settlement proceeds to Tim or Jill, and into various accounts that we now describe. The transactions and amounts we next describe are disputed in some respects by the parties, but the disputes are not material to our analysis that follows.

¶12 The amount of $27,500 was given to Tim,[7] and $25,000 was given to Jill. The record is unclear as to the account from which those funds were withdrawn, although the parties appear to agree that the checks to Tim and Jill were drawn from the money market account, or the date of the payments. Bonnie contends that Gerald instructed her to make these distributions from the settlement proceeds to Tim and Jill, and Tim and Jill do not dispute that fact.

---

[6] An "Accounting Breakdown" was prepared on August 25, 2016, by the law firm that represented the plaintiffs. That "Breakdown" stated that the "NET AMOUNT TO BE DISBURSED to Gerald and Bonnie Fruit" was $553,524.63. A check was issued by the law firm to "Gerald and Bonnie Fruit" on that same date in the amount of $503,524.63. It is unclear from the summary judgment record when the remaining $50,000 of the settlement proceeds were paid, but the parties seem to assume that the $50,000 amount was paid. While we observe that discrepancy, it is not material to our analysis.

[7] According to Bonnie, Tim received a slightly larger amount than Jill because Tim paid an initial fee to the attorney in Iowa for that attorney to investigate whether Gerald had a viable medical malpractice claim.

¶13     On August 31, 2016, a deposit was made to the money market account that was in Gerald's name only with Bonnie as POD on that account as mentioned earlier. The deposit was in the amount of $348,014.63. The record is unclear if the funds used to purchase the CDs, as discussed below, came out of the money market account, but the parties appear to implicitly agree to that fact.

¶14     On August 31, 2016, Bonnie deposited $50,000 in a CD at American Bank & Trust with a maturity date six months after issuance. Gerald and Bonnie were listed as joint owners of that CD. This CD was taken out using only Bonnie's signature.[8]

¶15     On October 5, 2016, a total of $50,000 was deposited in two CDs at Livingston State Bank.[9] Bonnie signed the CDs in her own name and as agent for Gerald. The first CD was in the amount of $10,000 with a maturity date six months after the date of issuance. The second CD was in the amount of $40,000 with a maturity date one year after the date of issuance. Each of those CDs listed "Bonnie [] Fruit or Gerald [] Fruit" as the owners of the CD with a right of survivorship.

¶16     A total of $60,000 was deposited by Bonnie in two CDs at People's State Bank. Each CD was in the amount of $30,000, and both CDs were owned by Bonnie in her name alone. The record does not indicate when these CDs were

---

[8] In her respondent's brief, Bonnie incorrectly asserts that this CD was solely in her name.

[9] In her respondent's brief, Bonnie incorrectly asserts that there was only one CD at Livingston State Bank.

opened or when they matured, but the parties appear to agree that these CDs were opened with the settlement proceeds and before Gerald's death.

¶17    Gerald's money market account with Bonnie as the POD beneficiary had a balance of $273,019.98 on the date of Gerald's death, December 10, 2016.

¶18    To sum up, it is undisputed that, during the approximately four months from receipt of the settlement proceeds until Gerald's death, Bonnie, acting as Gerald's attorney-in-fact, transferred over $433,000 of the settlement proceeds into the disputed accounts that she owned individually or jointly with Gerald before his death, or that she became sole owner of at Gerald's death by operation of law.

¶19    In January 2017, Bonnie executed a transfer by affidavit representing that the gross value of Gerald's estate subject to administration was $20,398.42.[10]  Bonnie issued cashier checks in the amount of $10,000 to both Tim and Jill.[11]   Tim filed a Petition for Formal Administration of Gerald's estate. Bonnie objected to formal administration of Gerald's estate and asserted in her response that only $20,398.42 of Gerald's estate was subject to administration.

¶20    Tim and Jill brought an action against Bonnie claiming that the settlement proceeds were Gerald's individual assets subject to administration in

---

[10] In her respondent's brief, Bonnie asserts that the $20,398.42 was the amount remaining in an account at Edward Jones.  However, Bonnie's cite to the record for this assertion does not support her allegation.

[11] Bonnie alleges that she used the other $398.42 to "pay taxes," and Tim and Jill do not dispute the point.

Gerald's estate. Tim and Jill make the following allegations in their first cause of action for declaratory relief that are pertinent to this appeal:

- The settlement proceeds were Gerald's sole and individual property under WIS. STAT. §§ 854.17, 861.01(3m), and 766.31(7)(f) (2017-18).[12]

- Bonnie transferred the settlement proceeds while acting as Gerald's POA.

- Bonnie deposited the settlement proceeds to the disputed accounts as discussed above.

- Bonnie's transfer of those funds to the disputed accounts, and her later receipt of those funds, violated Bonnie's fiduciary duties as Gerald's attorney-in-fact.

¶21    Tim and Jill also state a cause of action against Bonnie for tortious interference with an expected inheritance and request monetary damages against Bonnie for that interference. Germane to that claim, Tim and Jill allege:

- Tim and Jill were Gerald's sole beneficiaries under Gerald's will.

- Prior to Gerald's death, Bonnie "exercised control of Gerald's assets," "deposited or transferred some of Gerald's assets … into an[] account or accounts that were titled [solely] in Bonnie's name" and "deposited or transferred some of Gerald's assets … into an account or accounts that were jointly titled with Gerald, with survivorship rights to Bonnie," "with

---

[12] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

payable on death designations to Bonnie," and the assets remained in those accounts at the time of Gerald's death.

- In making such deposits or transfers, "Bonnie intended to retain the transferred or deposited property for herself, to the exclusion of [Tim and Jill]."

- Bonnie "had no authority to transfer Gerald's assets … other than under authority granted to her as the attorney-in-fact under Gerald's" POA, and those deposits and transfers "were contrary to Bonnie's fiduciary duties and responsibilities."

- But for "Bonnie's tortious breach of her fiduciary duties and responsibilities" as Gerald's attorney-in-fact, Tim and Jill would have received an inheritance from Gerald comprised of the deposits and transfers in the disputed accounts.

¶22 Bonnie moved for summary judgment requesting dismissal of each of the claims made by Tim and Jill. Tim and Jill moved for partial summary judgment on the breach of fiduciary duty element of their cause of action that Bonnie tortiously interfered with their expected inheritance. The circuit court granted summary judgment in favor of Bonnie and denied Tim and Jill's motion for partial summary judgment. The court then entered an order dismissing each of Tim and Jill's claims with prejudice. Tim and Jill appeal.

¶23 We set forth additional material facts in our discussion below.

**DISCUSSION**

**I. Standard of Review, Summary Judgment, and Governing Principles.**

¶24 This court reviews a grant or denial of summary judgment de novo, using the same methodology employed by the circuit court. *Bank of N.Y. Mellon v. Klomsten*, 2018 WI App 25, ¶31, 381 Wis. 2d 218, 911 N.W.2d 364. Summary judgment is proper, and the moving party is entitled to judgment as a matter of law, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2); *see Bank of N.Y. Mellon*, 381 Wis. 2d 218, ¶31. This court views the summary judgment materials "in the light most favorable to the party opposing summary judgment." *United Concrete & Constr., Inc. v. Red-D-Mix Concrete, Inc.*, 2013 WI 72, ¶12, 349 Wis. 2d 587, 836 N.W.2d 807. "[I]f more than one reasonable inference can be drawn from the undisputed facts, summary judgment is not appropriate." *Schmidt v. Northern States Power Co.*, 2007 WI 136, ¶47, 305 Wis. 2d 538, 742 N.W.2d 294.

¶25 This appeal requires us to interpret Gerald's POA. A "power of attorney is simply [a] written document authorizing the person to whom it is granted to act as the agent or attorney-in-fact for the principal [(the person granting the power of attorney)]. It is evidence that the holder of the power of attorney may act as the agent for the principal to the extent set forth therein." *Alexopoulos v. Dakouras*, 48 Wis. 2d 32, 39-40, 179 N.W.2d 836 (1970); *see also* WIS. STAT. § 244.02(9) ("'Power of attorney' means a writing or other record that grants authority to an agent to act in the place of the principal, whether or not the term power of attorney is used."), (1) ("'Agent' means a person granted authority

to act for a principal under a power of attorney, whether denominated an agent, attorney-in-fact, or otherwise."), and (11) ("'Principal' means an individual who grants authority to an agent in a power of attorney.").

¶26 In interpreting a power of attorney, we apply contract interpretation principles. *See Schmitz v. Firstar Bank Milwaukee*, 2003 WI 21, ¶22, 260 Wis. 2d 24, 658 N.W.2d 442 ("Agency agreements are generally subject to the same rules of interpretation as other contracts."). When we interpret a contract, our goal is to give effect to the parties' intentions. *See Town Bank v. City Real Estate Dev., LLC*, 2010 WI 134, ¶33, 330 Wis. 2d 340, 793 N.W.2d 476. "[T]he best indication of the parties' intent is the language of the contract itself." *Id.* "In the guise of construing a contract, courts cannot insert what has been omitted or rewrite a contract made by the parties." *Levy v. Levy*, 130 Wis. 2d 523, 533, 388 N.W.2d 170 (1986). The interpretation of a power of attorney presents a question of law that this court determines independently of the circuit court. *Schmitz*, 260 Wis. 2d 24, ¶32.

¶27 This appeal also requires this court to interpret statutes. The interpretation of a statute is a question of law that we determine independently of the circuit court. *Pasko v. City of Milwaukee*, 2002 WI 33, ¶23, 252 Wis. 2d 1, 643 N.W.2d 72. "[T]he purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect." *State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110. "We assume that the legislature's intent is expressed in the statutory language." *Id.* Accordingly, "statutory interpretation 'begins with the language of the statute.'" *Id.*, ¶45 (quoted source omitted). "If the meaning of the statute is plain, we ordinarily stop the inquiry." *Id.* (quoted source omitted). Our supreme court further notes:

11

> Context is important to meaning. So, too, is the structure of the statute in which the operative language appears. Therefore, statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results.

*Id.*, ¶46.

## II.  Were the Settlement Proceeds Gerald's Individual Property?

¶28    We begin our analysis with the parties' dispute regarding whether or not the settlement proceeds are marital property, because that determination affects the analysis of other disputes that the parties raise. Bonnie argues that there is no genuine issue of material fact that the settlement proceeds are marital property. From that premise, Bonnie contends that a maximum of one-half of the settlement proceeds could be distributed through Gerald's estate whether or not Bonnie had the authority to transfer the funds into the disputed accounts. Tim and Jill argue that the settlement proceeds are Gerald's "individual property" under Wisconsin law.

### A.  Additional Governing Principles.

¶29    If the facts are undisputed, application of the provisions of WIS. STAT. ch. 766 to facts concerning the classification of property owned by spouses is a question of law that we review de novo. *Estate of Kobylski v. Hellstern*, 178 Wis. 2d 158, 168, 503 N.W.2d 369 (Ct. App. 1993); *Lloyd v. Lloyd*, 170 Wis. 2d 240, 252, 487 N.W.2d 647 (Ct. App. 1992).

¶30    A decedent who is married may freely dispose of the whole of his or her individual property, but may dispose of only his or her one-half of the marital property. *Estate of Kobylski*, 178 Wis. 2d at 168; *Lloyd*, 170 Wis. 2d at 252; *see*

12

WIS. STAT. § 861.01. All property of spouses is presumed to be marital property unless that property is classified otherwise by, as examples, the exceptions listed in WIS. STAT. § 766.31(3)-(7). Sec. 766.31(1)-(7); *Lloyd*, 170 Wis. 2d at 253-54. The parties (here, Tim and Jill) challenging the marital property presumption have "the burden to establish that the property at issue is not marital." *Estate of Kobylski*, 178 Wis. 2d at 170.

¶31 Pertinent here is WIS. STAT. § 766.31(7)(f). That statutory subpart provides in relevant part:

> Property acquired by a spouse during marriage and after the determination date[13] *is individual property if acquired ... [a]s a recovery for personal injury ... except* for the amount attributable to loss of income during marriage.

*Id.* (emphasis added).

### B. Analysis.

¶32 The summary judgment materials establish the following undisputed facts.

¶33 In 2013, Gerald sustained personal injuries during a medical procedure. The record does not show that Gerald, age seventy-six at the time the injuries occurred, lost any income because of those injuries, and Bonnie does not make that argument. The medical malpractice lawsuit against Gerald's doctor was resolved by a settlement agreement in which an insurer agreed to pay a specified sum in exchange for a release from liability for any claims based on Gerald's

---

[13] The "determination date" in this context is the date of Gerald and Bonnie's marriage in 1992. *See* WIS. STAT. § 766.01(5).

13

personal injuries. The only reasonable conclusion from those undisputed facts is that the settlement proceeds were, in the verbiage of WIS. STAT. § 766.31(7)(f), a "recovery" for Gerald's "personal injury," and none of those funds were "attributable" to a loss of income. Those undisputed facts, standing alone, support a summary judgment determination that the settlement proceeds are Gerald's individual property.

¶34 But, Bonnie's sole assertion that the settlement proceeds are not all Gerald's individual property is that she had a "loss of consortium claim which was part of the [medical malpractice] lawsuit."[14] Bonnie gives no citation to the record to support this assertion, such as a pleading from the medical malpractice lawsuit. However, Bonnie was a party to the medical malpractice lawsuit, and that is some evidence that she may have made a claim in that action. In addition, our own review of the record shows that the release that was executed as part of the settlement of the medical malpractice lawsuit was signed by Bonnie (and by Bonnie on behalf of Gerald), and that document states that the persons signing the release are releasing "[a]ny consortium claims by the parties."[15] However, the language in the release does not by itself answer the question of whether Bonnie actually made, or was compensated for, a loss of consortium claim in the medical malpractice lawsuit because the language of the release makes clear that the parties to that agreement are releasing claims that may not have been expressly made in the lawsuit:

---

[14] Bonnie does not argue that any portion of the settlement proceeds are her individual property under WIS. STAT. ch. 766.

[15] Tim and Jill also signed the release, but they make no assertion that any loss of consortium claim they had as the adult children of Gerald had any monetary value in the settlement of the medical malpractice lawsuit.

> In consideration of theses [sic] payment we release, acquit and forever discharge [the released parties] from any and all liability whatsoever, including all claims, demands and causes of action of every nature affecting us, which we may have or ever claim ….

In addition, Bonnie concedes that there is no "breakdown of what and/or whom the settlement money was compensating."

¶35    Bonnie contends that it is relevant that her name was on the check for the settlement proceeds along with Gerald's name.  However, that fact is not dispositive, and Bonnie does not contend that it is.  "Title functions principally to establish management and control rights.  Consistent with this principle, the right to manage and control property neither determines classification nor rebuts the presumption favorable to marital property."[16]  *Lloyd*, 170 Wis. 2d at 255.

¶36    There is disputed evidence in the record that Bonnie may have made a loss of consortium claim in the medical malpractice lawsuit, but there is insufficient evidence to conclude, based on this record, that Bonnie actually made a loss of consortium claim in the medical malpractice lawsuit, that she was compensated for such a claim in the settlement of that suit, or the percentage of the settlement proceeds attributable to her loss of consortium claim as opposed to the amount attributable to Gerald's personal injuries.

---

[16] Further, Bonnie may be attempting to make a separate argument that the settlement proceeds were "mix[ed] … enough" that the settlement proceeds became marital property. However, this potential attempt at an argument is not developed by Bonnie in any discernable way. *State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (declining to address undeveloped arguments).  In any case, as will be seen below, Bonnie contends that the settlement proceeds were initially placed in an account that was solely in Gerald's name, and that undercuts any "mix[ing]".

¶37 There are genuine issues of material fact as to whether the settlement proceeds are Gerald's individual property, whether a portion are marital property, and the amount in each category. Accordingly, we conclude that Bonnie has not met her burden to establish on summary judgment that any of the settlement proceeds are marital property, and we remand this issue to the circuit court for further proceedings.

¶38 We now turn to other issues, the resolution of which will assist the circuit court on remand.

### III. Did Bonnie Breach Her Fiduciary Duty?

¶39 Bonnie contends that the undisputed facts establish that she did not breach her fiduciary duty to Gerald in making the deposits into the disputed accounts through which she received the funds before, or at, the time of Gerald's death. From that, Bonnie argues that the funds were properly not part of Gerald's probate estate and Tim and Jill's claims fail as a matter of law.

¶40 In their partial summary judgment motion, Tim and Jill argue that Bonnie breached her fiduciary duties to Gerald as Gerald's attorney-in-fact because Bonnie was barred from "self-dealing" and from "mak[ing] gratuitous transfers of [Gerald's] assets to *anyone*," including Bonnie herself, "unless [Gerald's POA] … expressly grant[ed] [Bonnie] the authority to make such transfers" or to engage in self-dealing.[17]

---

[17] Tim and Jill's motion for partial summary judgment concerned Bonnie's alleged breach of fiduciary duty in regard to their tortious interference with inheritance cause of action. However, Bonnie's arguments in response to that partial summary judgment motion are identical to the arguments she makes regarding her alleged breach of fiduciary duty regarding Tim and Jill's cause of action which requested declaratory relief and also alleges that Bonnie breached her

(continued)

16

## A. Additional Governing Principles Regarding a POA.

¶41     The relationship between the holder of a power of attorney and the principal is that of a fiduciary. *See **Praefke v. American Enter. Life Ins. Co.**,* 2002 WI App 235, ¶9, 257 Wis. 2d 637, 655 N.W.2d 456; *see also **Alexopoulos**,* 48 Wis. 2d at 40. "The agent's duty is to act solely for the benefit of the principal in all matters connected with the agency, even at the expense of the agent's own interest." ***Praefke**,* 257 Wis. 2d 637, ¶9. WISCONSIN STAT. § 244.14(2) states in pertinent part:

> Except as otherwise provided in the power of attorney, an agent who has accepted an appointment shall do all of the following:
>
> (a) Act loyally for the principal's benefit.
>
> (b) Act so as not to create a conflict of interest that impairs the agent's ability to act impartially in the principal's best interest.
>
> (c) Act with the care, competence, and diligence ordinarily exercised by agents in similar circumstances.[18]

---

fiduciary duty. We agree with Bonnie that the issues regarding breach of fiduciary duty are identical in each cause of action and see no reason not to decide any breach of fiduciary duty issues identically for each of Tim and Jill's causes of action.

[18] The Uniform Power of Attorney for Finances and Property Act, WIS. STAT. ch. 244, was enacted in May 2010, after ***Praefke v. American Enter. Life Ins. Co.**,* 2002 WI App 235, 257 Wis. 2d 637, 655 N.W.2d 456 and ***Alexopoulos v. Dakouras**,* 48 Wis. 2d 32, 179 N.W.2d 836 (1970) were decided. *See* 2009 Wis. Act 319; WIS. STAT. § 244.01; *see also **State v. Bryzek**,* 2016 WI App 48, ¶14, 370 Wis. 2d 237, 882 N.W.2d 483 (noting that ***Praefke*** was decided before the adoption of WIS. STAT. ch. 244).

The provisions of WIS. STAT. ch. 244 coexist with those case law holdings mentioned in this section of the opinion because the case law holdings are consistent with the applicable provisions of ch. 244. *See **Fuchsgruber v. Custom Accessories, Inc.**,* 2001 WI 81, ¶25, 244 Wis. 2d 758, 628 N.W.2d 833 ("It is axiomatic that a statute does not abrogate a rule of common law unless the abrogation is clearly expressed and leaves no doubt of the legislature's intent…. To accomplish a change in the common law, the language of the statute must be clear, unambiguous, and peremptory.").

¶42    We have interpreted our supreme court's opinion in *Alexopoulos* as establishing a "bright-line rule" that, "unless the power of attorney specifically allows the agent to gift property to himself or herself, or contains an 'unlimited or unbridled' gifting power, the agent lacks authority to make gratuitous transfers." *Praefke*, 257 Wis. 2d 637, ¶¶10, 16 (analyzing and quoting *Alexopoulos*, 48 Wis. 2d at 40-41).    Put another way, the general rule is that an attorney-in-fact is not "allowed to feather his or her own nest," "self-dealing" is not allowed by the agent, and "gratuitous transfers of a principal's assets" may not be made by the agent.    *Id.*, ¶¶12, 20.    There is an exception to that general rule if the POA "specifically allows such conduct," "that power [is] … specifically authorized in the instrument," and the POA "expressly and unambiguously grants the authority to do so."    *Id.*; *see also **Russ v. Russ***, 2007 WI 83, ¶32, 302 Wis. 2d 264, 734 N.W.2d 874 (stating that a fiduciary, such as a POA agent, "has an obligation not to engage in self-dealing").

¶43    These holdings that an agent's authority to give the agent a gift or to self-deal must be specifically set forth in the POA are codified in WIS. STAT. § 244.07(2), which states that "[u]nless specifically stated, a power of attorney does not authorize gifting, self-dealing, or oral amendment of the power of attorney, and any such specific authority shall be strictly construed," and WIS. STAT. § 244.41(1)(b), which states:

> An agent under a power of attorney may do any of the following on behalf of the principal or with the principal's property *only if the power of attorney expressly grants the agent the authority* and the exercise of that authority is not otherwise prohibited by another agreement or instrument to which the authority or property is subject:
>
> ….

(b) Make a gift.

(Emphasis added.)

¶44    Further, "[w]hen a POA agent, for the agent's own use, transfers funds deposited by the principal, without written authority in the POA document to do so, a presumption of fraud is created, regardless of whether the funds were deposited before or after the execution of the POA." *Russ*, 302 Wis. 2d 264, ¶32.

### B. Pertinent Provisions of Gerald's POA.

¶45    With those governing principles as context, we now set forth the pertinent provisions of Gerald's POA:

> I grant my agent … authority to act for me with [sic] as defined in the Uniform Power of Attorney for Finances and Property Act in chapter 244 of the Wisconsin [S]tatutes:
>
> I want to include the following in agent's general authority:
>
> ….
>
> **Banks and other financial institutions[.]**    To deposit and withdraw funds, including social security checks, in or from any financial institution….
>
> ….
>
> **Make gifts[.]**    To *transfer without consideration* any or all of the assets belonging to me *which may be advisable for the purpose of estate planning, avoiding probate, or preserving my assets within my family*. I direct, however, that the person holding this power *shall make said transfers only to those persons and in such proportions as provided in my will* or trust, or if I have no will or trust, as my probate estate would be distributed under Wisconsin law. I authorize my attorney at law to disclose the terms of my last will and testament to the person holding this power. I further direct that my agent may be an eligible donee if he obtains the consent in writing of any other donee.

19

….

LIMITATION ON AGENT'S AUTHORITY

An agent who is not my spouse or domestic partner MAY NOT use my property to benefit the agent or a person to whom the agent owes an obligation of support unless I have included that authority in the special instructions.

(Emphasis added.)

## C. Interpretation of Gerald's POA.

¶46    Tim and Jill argue that Bonnie breached her fiduciary duty to Gerald by depositing the settlement proceeds into the disputed accounts because Gerald's POA did not expressly and unambiguously grant Bonnie authority to make transfers without consideration of Gerald's individual property through a gift to herself or by self-dealing.  Bonnie does not dispute that, in order for her as Gerald's attorney-in-fact to have authority to make gifts to herself or to engage in self-dealing, such authority must be clearly authorized in the POA.  Bonnie argues that Gerald's POA "specifically authorized Bonnie" to do so.  We disagree for the following reasons.

¶47    Prior to continuing our analysis, we summarize Bonnie's actions to give context to our discussion.  Bonnie knew at the time of the settlement of the medical malpractice lawsuit that Gerald's will required that all of his assets subject to probate would go to Tim and Jill in equal shares with none of his probate assets going to her.  In the less than four months between receipt of the settlement proceeds from the medical malpractice litigation and the time of Gerald's death, Bonnie placed approximately $433,000 in accounts that caused her to be owner of those funds either before Gerald died or at the time of Gerald's death by operation of law and outside probate.  Those actions included depositing $100,000 in CDs

jointly held by Bonnie and Gerald, depositing $60,000 in CDs owned solely by Bonnie, and by depositing and leaving approximately $273,000 in the money market account that existed before the receipt of the settlement proceeds and was solely in Gerald's name but with Bonnie as the POD on that account.

¶48    We focus our discussion on the "Make gifts" paragraph of Gerald's POA because it expresses his intent on the subject of the gifting authority of his agent.[19]  That provision directs that Bonnie was authorized to "transfer" Gerald's "assets" "without consideration," but only under circumstances specified in that paragraph which we now consider.[20]

¶49    Bonnie had such authority when "advisable" for only three purposes: (1) "estate planning"; (2) "avoiding probate"; or (3) "preserving [Gerald's] assets within my family."  Bonnie does not contend that her deposits in the disputed accounts were "advisable" in light of those three purposes or that her actions were meant to accomplish any of these purposes.  Indeed, Bonnie's arguments in this court fail to engage with the language of the "Make gifts" provision of the POA.  Regardless of Bonnie's intent, we observe that her deposits into the disputed accounts certainly had the effect of avoiding probate for the $433,000 amount described above.

---

[19]  WISCONSIN STAT. ch. 244 includes a form durable power of attorney prepared by the Department of Health Services.  See WIS. STAT. §§ 244.61 and 244.63.  The wording of the "Make gifts" provision of Gerald's POA is not drawn from that statutory form.  See § 244.61.

[20]  Bonnie does not dispute that her deposits into the disputed accounts were "transfers without consideration."  As will be seen later in this opinion, Bonnie contends that some of those deposits were not "gifts" to herself.

¶50    If such a transfer is advisable for one of those three purposes, the second sentence of that provision mandates another requirement.  Bonnie may make transfers without consideration "only to those persons and in such proportions as provided in my will."  In his will, Gerald bequeathed all probate assets to Tim and Jill.  Bonnie does not, and cannot, argue that her transfers of money into the disputed accounts were done in compliance with this requirement of Gerald's POA.[21]

¶51    In short, nothing in the plain language of the "Make gifts" provision of Gerald's POA expressly and unambiguously specified that Bonnie had authority to deposit the settlement proceeds in the disputed accounts as she did.  The undisputed facts establish that Bonnie's actions violated the "Make gifts" provision of the POA.

### D.  "Limitation on Agent's Authority" Provision of the POA.

¶52    Bonnie argues that, in spite of Gerald's intentions expressed in the "Make gifts" provision of the POA, her transfers into the disputed accounts were proper based on language in another paragraph of the POA.  More specifically, Bonnie asserts that the following language in Gerald's POA "specifically authorized" her to make gifts to herself and engage in self-dealing:

> An agent who is not my spouse or domestic partner
> MAY NOT use my property to benefit the agent or a
> person to whom the agent owes an obligation of support

---

[21] The "Make gifts" provision of Gerald's POA adds another requirement and states that Gerald's agent "may be an eligible donee" of a gift if the agent "obtains the consent in writing of any other donee."  Because we conclude that Bonnie violated another requirement of this provision, we need not consider this condition.

unless I have included that authority in the special instructions.[22]

Because the heading for that paragraph is "Limitation on Agent's Authority," we will refer to this provision as the "limiting language."

¶53   Bonnie argues that, because the limiting language contains a double negative, the sentence must be read as though the negatives, and the final clause, are omitted from the sentence.   Under Bonnie's interpretation, the limiting language should be read as follows (with strikes shown as advocated by Bonnie and the inapplicable "domestic partner" phrase deleted entirely):   "An agent who is ~~not~~ my spouse ~~or domestic partner~~ MAY ~~NOT~~ use my property to benefit the agent ~~unless I have included that authority in the special instructions~~."   We reject Bonnie's interpretation of the limiting language for the following reasons.

¶54   First, Bonnie contends that her reading of the limiting language is "established in case law."   Bonnie points only to ***Adams v. State Livestock Facilities Siting Review Board***, 2010 WI App 88, 327 Wis. 2d 676, 787 N.W.2d 941 (Ct. App. 2010) in support of that contention.   In ***Adams***, this court stated that "[t]he double negative" in the statutory phrase "'may not disapprove or prohibit' … necessarily means 'must approve.'"   ***Id.***, ¶19 (quoting WIS. STAT. § 93.90(3)(a)

---

[22] On the durable power of attorney form in WIS. STAT. ch. 244, there is a space for "special instructions." *See* WIS. STAT. § 244.61 (capitalization omitted).   Our supreme court has stated:

> One way to avoid future uncertainty about the intentions of parties to a POA would be to have the principal write clearly his or her intentions into the POA document.   The Wisconsin Basic Power of Attorney for Finances and Property form has blank lines at the end of the form that could be used for such a purpose.

***Russ v. Russ***, 2007 WI 83, ¶30, 302 Wis. 2d 264, 734 N.W.2d 874.   It is undisputed that there were no such "special instructions" from Gerald in the POA.

23

(2007-08)). The concept of a "double negative" was discussed in *Adams* in only the one sentence just mentioned.[23]

¶55    The statement in *Adams* is correct in the context of the specific statutory subpart at issue in that case. However, Wisconsin case law does not "establish" the expansive contention Bonnie makes regarding the use of double negatives in all writings. Bonnie does not cite, and we have not found, a Wisconsin opinion which interprets an instrument such as a power of attorney that uses a double negative. In fact, in *Hedger v. State*, 144 Wis. 279, 128 N.W. 80 (1910), our supreme court addressed whether a jury instruction was misleading and, relevant to this appeal, stated that "double negatives" are not always understood by ordinary people as an affirmative expression. *Id.* 128 N.W. at 92.

¶56    Second, Tim and Jill argue that the limiting language is substantially different from the statutory subpart at issue in *Adams*. More specifically, Tim and Jill contend that in *Adams*, the double negatives "involved only verb structure," whereas the first of the double negatives in the limiting language "relates to the subject of the sentence – the Agent." They contend that, unlike the statutory subpart that was interpreted in *Adams*, "cancelling out" the negatives in the limiting language cannot be the proper interpretation. We agree that Bonnie's interpretation is based on too slim a reed. To confirm the point, for the limiting language in Gerald's POA to have the meaning that Bonnie suggests, not only must the "not[s]" be eliminated, so too must the phrase "unless I have included

---

[23] Regrettably, neither Bonnie nor Tim and Jill inform us that the *Adams* case was appealed to our supreme court. *See Adams v. State Livestock Facilities Siting Rev. Bd.*, 2012 WI 85, ¶40-46, 342 Wis. 2d 444, 820 N.W.2d 404. In that opinion, the court interpreted the meaning of the statutory subpart at issue without mentioning the double negative.

that authority in the special instructions." Stated another way, the limiting language cannot be understood as stating that a spouse may use Gerald's property to benefit the spouse simply by cancelling out the two "not[s]" in the provision, and Bonnie suggests no basis to eliminate the verbiage about "special instructions."

¶57 Third, Bonnie's argument requires that the word "benefit" in the limiting language's phrase "benefit the agent" means a "gift" or "self-dealing." However, Bonnie does not attempt to support that interpretation with any reasoning. The "Make gifts" paragraph of the POA uses the terms "gifts" and "transfer without consideration." The use of the term "benefit" is a very unlikely way for Gerald to attempt to negate the language in the "Make gifts" paragraph as Bonnie contends.

¶58 To summarize, WIS. STAT. ch. 244 and case law require express and unambiguous language for an agent to properly make a gift to the agent or self-deal the principal's assets.[24] The "Make gifts" paragraph in the POA expresses Gerald's intent that his agent may make "gifts" or "transfers without consideration" of his assets in specified circumstances only. The limiting language is not express and unambiguous on this point. For that reason, the limiting language does not negate the explicit terms in the "Make gifts" paragraph, or establish that Bonnie as Gerald's agent may make gifts to herself or engage in self-dealing. Accordingly, we conclude that there is no genuine issue of material

---

[24] An example of such clear and unambiguous language is that used in the power of attorney at issue in **Bryzek**, 370 Wis. 2d 237, ¶15: "The plain language of E.B.'s POA specifically granted Bryzek the authority to '[m]ake gifts of any kind, including gifts' to himself."

fact that, under the terms of Gerald's POA, Bonnie breached her fiduciary duty to Gerald in placing the settlement proceeds in the disputed accounts.

¶59    Bonnie argues that there are other reasons, outside the language of the POA, why we should conclude that she did not breach her fiduciary duty to Gerald, and we discuss those arguments next.

### E.  Bonnie May Argue That She Had Specific Authority Under WIS. STAT. § 244.41(2).

¶60    The argument is difficult to discern, but Bonnie appears to argue that, pursuant to WIS. STAT. § 244.41(2), she was permitted to deposit the settlement proceeds in the disputed accounts.  Section 244.41(2) provides in pertinent part:

> Notwithstanding a grant of authority to do an act described in sub. (1), unless the power of attorney otherwise provides, an agent who is not a spouse … may not do any of the following:
>
> (a) Exercise authority under a power of attorney to create in the agent an interest in the principal's property, whether by gift, right of survivorship, beneficiary designation, disclaimer, or otherwise.

With no discernable explanation, Bonnie appears to contend that the legislature authorized her, as Gerald's spouse, to make gifts to herself and self-deal regardless of Gerald's contrary intentions expressed in the POA or any fiduciary duty she owes to Gerald as his agent.  We are not persuaded and reject that absurd result. *See Kalal*, 271 Wis. 2d 633, ¶46 (stating we must construe statutes to avoid absurd results).

¶61    Two provisions of WIS. STAT. ch. 244 suffice to establish that the language of the POA controls in these circumstances.  We repeat the pertinent

language in WIS. STAT. § 244.41(1) which sets forth those powers an agent may undertake on behalf of the principal provided that the agent is given a specific grant of authority to do so in the POA:

> An agent under a power of attorney may do any of the following on behalf of the principal or with the principal's property *only if the power of attorney expressly grants the agent the authority and the exercise of that authority* …:
>
> ….
>
> (b)  *Make a gift*.

*Id.* (emphasis added).  To confirm this point, we also repeat the language in WIS. STAT. § 244.07(2) which states that "[u]nless specifically stated, a power of attorney does not authorize gifting [or] self-dealing …."[25]

¶62    Applying these statutes here, in order for Bonnie to properly make a gift to herself or self-deal, Gerald's POA must expressly and unambiguously give Bonnie authority to do so.  Gerald's POA authorized Bonnie to "gift" or make a "transfer without consideration" of Gerald's assets only under specific circumstances.  As explained above, Bonnie's gifts or transfers into the disputed accounts do not come within any of the circumstances Gerald specified in the POA.  Simply stated, Bonnie did not have authority under the express terms of Gerald's POA to make the transfers to the disputed accounts.  Bonnie's reliance on WIS. STAT. § 244.41(2) is, thus, unavailing.

---

[25]  No party cites, or relies on, WIS. STAT. § 244.57 regarding gifts.  Accordingly, we also ignore that statute.

### F. Bonnie Argues That She Had Authority Under a Separate Document.

¶63 Next, Bonnie argues that she did not need specific authority under Gerald's POA to deposit, or withdraw, the settlement proceeds to or from the money market account because, in 2009, Gerald designated her as his agent with that bank for that account. Specifically, Gerald executed a document entitled "Agent (Power of Attorney Designation For account Entitled Gerald L. Fruit" (uppercase omitted) in which Bonnie is identified as Gerald's agent and is granted the authority to deposit, or withdraw, funds.[26] We disagree with Bonnie.

¶64 Bonnie's argument ignores the fact that, years later, she became Gerald's fiduciary and agreed to handle Gerald's assets as Gerald mandated in his POA. As a result, while the 2009 instrument signed by Gerald and Gerald's POA gave Bonnie authority to deposit, or withdraw, funds to and from Gerald's financial institution accounts, the POA instructs Bonnie on whether she can make such deposits or withdrawals consistent with Gerald's intentions expressed in his POA. Bonnie does not attempt to explain why her agency on Gerald's financial institution accounts relieved her of her fiduciary duty to act within the scope of Gerald's POA when transferring Gerald's assets. We decline an attempt to make such an argument for her. *See Associates Fin. Servs. Co. of Wis., Inc. v. Brown*, 2002 WI App 300, ¶4 n.3, 258 Wis. 2d 915, 656 N.W.2d 56.

---

[26] There is no statement under oath stating that this document is authentic. Rather, Bonnie simply attached it to her summary judgment motion.

### G. Bonnie Argues That She Did Not "Gift" the Settlement Proceeds.

¶65    Bonnie argues that she did not give herself a "gift" when she deposited the settlement funds in the money market account that was in Gerald's name only (albeit with Bonnie as POD on that account) and, therefore, that action was not contrary to the "Make gifts" provision of Gerald's POA.[27]    Tim and Jill argue that the undisputed material facts establish that Bonnie's deposit into that account breached the fiduciary duty Bonnie owed to Gerald.

¶66    The following factors must be proven to establish an inter vivos gift: "(1) Intention to give on the part of the donor; (2) delivery, actual or constructive, to the donee; (3) termination of the donor's dominion over the subject of the gift; and (4) dominion in the donee." *Schreiber v. Kellogg-Citizens Nat'l Bank*, 68 Wis. 2d 135, 145, 227 N.W.2d 917 (1975).    Bonnie contends that the second (delivery to the donee) and fourth (dominion in the donee) factors are not present. Bonnie's theory is that the settlement proceeds placed in the money market account were not delivered to her and that she did not exercise dominion over those funds because:

1.  The money market account was in Gerald's name alone up until his death, so only Gerald owned those funds during his lifetime, *see* WIS. STAT. § 705.03(2) (stating "[a] P.O.D. account belongs to the original payee

---

[27]    In this section of Bonnie's brief in this court, Bonnie does not contend that the portion of the settlement proceeds that were in her name only or in her name jointly with Gerald were not "gifts." *See Fischer v. Wisconsin Patients Comp. Fund*, 2002 WI App 192, ¶1 n.1, 256 Wis. 2d 848, 650 N.W.2d 75 (argument asserted by the appellant and not disputed by the respondent may be taken as admitted).

during the original payee's lifetime and not to the P.O.D. beneficiary or beneficiaries"); and as a result,

2. Gerald, not Bonnie, maintained control and dominion over the money in that account because Gerald could have spent that money at any time.

¶67     We reject Bonnie's argument because, whether this particular act of Bonnie's was a "gift" to herself is not dispositive.  The issue, as properly framed by Tim and Jill, is whether Bonnie breached her fiduciary duty to Gerald by transferring settlement proceeds into the money market account.

¶68     In *Praefke* the agent, under her authority as POA, changed POD beneficiary designations in which she had no ownership interest so that she was the only POD beneficiary for those accounts.  *Praefke*, 257 Wis. 2d 637, ¶¶3, 15. We determined that those actions were "self-dealing" and, therefore, were a breach of the agent's fiduciary duty to the principal.  *See id.*, ¶¶6, 8; *see also* WIS. STAT. §§ 244.07(2); 244.14(2); *Russ*, 302 Wis. 2d 264, ¶28 (recognizing a prohibition against "self-dealing" by an agent "unless the power to self-deal is written in the POA document").

¶69     For those reasons, whether Bonnie's transfer of settlement proceeds into the money market account was a "gift" to herself is not dispositive.  Instead, the undisputed material facts establish that Bonnie breached her fiduciary duty to Gerald by her acts of self-dealing in transferring the settlement proceeds into the money market account which only she, rather than Tim and Jill, would receive on Gerald's death and outside of probate.

### H.  Bonnie Argues That There is a Presumption of Donative Intent.

¶70     Bonnie contends that Gerald's designation of her as the POD beneficiary for the money market account in 2009, years prior to the execution of his POA, creates a presumption of Gerald's donative intent to make a gift to Bonnie of any funds deposited in that account.  For this, Bonnie relies on ***Russ*** in which the supreme court concluded that a joint checking account established under WIS. STAT. § 705.03(1) between a principal and an agent prior to the execution of a power of attorney creates a presumption of donative intent from the principal to the agent.  ***Russ***, 302 Wis. 2d 264, ¶31.

¶71     Bonnie concedes, as she must, that the money market account was owned solely by Gerald during his lifetime.  Regardless, Bonnie's sole attempt to argue around that fact is to pronounce in a conclusory fashion that "[i]t is not a stretch to infer … that when a [payable on death] designation is created prior to an executed Durable Power of Attorney[,] it creates a presumption of donative intent."  We are not persuaded.

¶72     As Tim and Jill point out, joint checking accounts and POD accounts solely in one person's name are different species in ways that matter here.  A joint checking account "belongs, during the lifetime of all parties, to the parties without regard to the proportion of their respective contributions to the sums on deposit." *See* WIS. STAT. § 705.03(1).  In contrast, and as noted, a POD account "belongs to the original payee during the original payee's lifetime and not to the [payable on death] beneficiary or beneficiaries." *See* § 705.03(2).  Bonnie fails to explain why the material differences between joint checking accounts and POD accounts are not determinative on the question of Gerald's donative intent, and we decline an attempt to develop Bonnie's argument for her. *See **State v. Pettit***, 171 Wis. 2d

627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (stating that an appellate court may decline to address issues that are inadequately brief).

### I. Bonnie Argues that Gerald Directed Her to Transfer $170,000 to Herself and She Acted in Good Faith.

¶73     To this point in our analysis, there is no genuine issue of material fact that Bonnie breached her fiduciary duty owed to Gerald as his agent by transferring funds to the disputed accounts.  However, we conclude that there are factual disputes that must be resolved on remand as to whether Bonnie's alleged "good faith" may lead to a determination that Bonnie did not breach her fiduciary duty owed to Gerald regarding $170,000 of the settlement proceeds Bonnie transferred into CDs.  The disputed material facts mentioned in this section of this opinion must be resolved by the circuit court on remand concerning Bonnie's alleged breach of her fiduciary duty as to the transfers of $170,000.

¶74     Bonnie argues that her transfers to CDs of $170,000 of the settlement proceeds were proper because Gerald directed her to transfer those amounts to herself, and she did so in good faith based on Gerald's directions and her purported lack of understanding about POD accounts.[28]  We first address whether there is a genuine issue of material fact that Gerald directed Bonnie to transfer those settlement proceeds to herself.

---

[28] Neither party makes a developed argument based on Bonnie's alleged lack of understanding about POD accounts and how that may affect her argument regarding good faith. On remand, any evidence on this allegation is to be considered along with other issues mentioned in this section of the opinion.

¶75 To establish that there is no genuine issue of fact regarding the $170,000 transferred to the CDs, Bonnie asserts only that Tim and Jill, "by the filing of [their] partial summary judgment [motion], ... stipulated to the fact that Gerald wanted Bonnie to have $170,000.00 in her sole name." Tim and Jill argue that a factual dispute bars Bonnie's summary judgment motion as it concerns the alleged directions from Gerald to Bonnie. Unfortunately, the parties' record on this point is less than clear.

¶76 In a filing in the circuit court, Tim and Jill may have stated, but it is not entirely clear, that they do not dispute that Gerald directed Bonnie to transfer to herself $50,000 from the settlement proceeds. Tim and Jill may also be agreeing to the same point in this court when in briefing they state: "However, after Bonnie distributed the settlement funds as directed by Gerald to herself ($50,000), Tim ($27,500), and Jill ($25,000), Bonnie deposited the remainder into accounts in which she was the payable on death beneficiary." Nonetheless, in other parts of their briefing in this court, Tim and Jill appear to take the position that none of the $170,000 Bonnie put in the CDs was directed by Gerald, and there is a material dispute of fact on that issue. Bonnie's briefing recognizes Tim and Jill's contention that this is a factual dispute: "Although Tim and Jill admit Gerald directed these transfers [the $25,000 to Jill and $27,500 to Tim], they state there are issues of material fact as to the remainder of the transfers described above [the $170,000 Bonnie ultimately received through the CDs]."

¶77 For those reasons, we reject Bonnie's argument that Tim and Jill have "stipulated" that Gerald directed her to make those transfers to herself. We conclude that there is a genuine issue of material fact as to what directions, if any, Gerald gave to Bonnie about the $170,000 of transfers she made to the CDs from the settlement proceeds.

¶78    Next, Tim and Jill assert that, regardless of Bonnie's allegations about Gerald's purported directions, any such directions are not admissible in evidence.   Evidence that Gerald directed Bonnie to give herself $170,000 is extrinsic evidence.  This court held in ***Praefke*** that evidence extrinsic to the power of attorney is not admissible to show that an agent was authorized to make gifts to himself or herself.  ***Praefke***, 257 Wis. 2d 637, ¶¶15-18, 20.

¶79    However, in ***Russ***, our supreme court created an exception to that extrinsic evidence exclusion.  *See **Russ***, 302 Wis. 2d 264, ¶36.  The supreme court recognized in ***Russ*** that the prohibition against the admissibility of extrinsic evidence set forth in ***Praefke*** may not always apply to prohibit evidence of donative intent.  *See id.*, ¶36.  Bonnie argues that, as in ***Russ***, this court may look to extrinsic facts to determine Gerald's donative intent.   The briefing from the parties in this court is insufficient to determine if Bonnie's proffered evidence of Gerald's direction is inadmissible.

¶80    Bonnie asserts that the evidence of Gerald's directions to her is relevant and will show that her transfer of the $170,000 settlement proceeds into the CDs was proper because she acted in "good faith" based on Gerald's directions.

¶81    WISCONSIN STAT. § 244.14(1) and (2) sets forth the duties (unless otherwise provided in the POA) of a person who accepts appointment under a POA.  Among the duties listed in § 244.14(1) is the duty to "[a]ct only within the scope of authority granted in the power of attorney."  *See* § 244.14(1)(c).  Among the duties listed in § 244.14(2) is the duty to "[a]ttempt to preserve the principal's estate plan, to the extent actually known by the agent, if preserving the plan is consistent with the principal's best interest based on all relevant factors …."

Sec. 244.14(2)(f). But, § 244.14(3) states: "An agent who acts in good faith is not liable to any beneficiary of the principal's estate plan for failure to preserve the plan." "'Good faith' means honesty in fact." WIS. STAT. § 244.02(6). Whether a party to a contract acted in good faith is usually a question of fact. *Wisconsin Nat. Gas Co. v. Gabe's Constr. Co.*, 220 Wis. 2d 14, 24 n.6, 582 N.W.2d 118 (Ct. App. 1998) (recognizing that "it is ordinarily a question of fact whether a party to a contract has breached its obligations of good faith and fair dealing").

¶82    At this point, we do not decide whether evidence about Gerald's directions to Bonnie is admissible or whether Gerald gave Bonnie any such directions. However, if the circuit court concludes that evidence of those alleged directions from Gerald to Bonnie is admissible, then for the reasons we are about to discuss, any such directions may be relevant to Bonnie's "good faith" in not preserving Gerald's estate plan.

¶83    Tim and Jill, as noted, take the position that the entire amount of the settlement proceeds was Gerald's individual property. As well, Tim and Jill concede that Gerald owned the money market account in his name and, accordingly, had the right to transfer the money into that account as he wished before he died or direct gifts from that account.

¶84    As already discussed, Bonnie's transfers without consideration must be consistent with the "Make gifts" provision of the POA, and that provision required any such transfers without consideration to be made in the "proportions" stated in Gerald's will. But these transfers to Tim and Jill were not consistent with Gerald's estate plan. Indeed, Tim and Jill agree that Gerald told Bonnie to give $25,000 of the settlement proceeds to Jill several months before his death and that $27,500 be paid to Tim at the same time. If, as Tim and Jill contend, Bonnie must

make gifts that are consistent with the "Make gifts" provision of the POA, these gifts to Jill and Tim were not completely consistent with Gerald's estate plan (as required by the POA). His will required that Tim and Jill receive exactly the same amounts, and Tim and Jill did not receive identical amounts consistent with Gerald's will. As a result, Tim and Jill necessarily agree that Gerald could direct Bonnie to make transfers without consideration from the money market account which contained the settlement proceeds that were not consistent with the specific intentions stated in Gerald's will and his POA.

¶85 Accordingly, there are issues that must be resolved on remand. Those questions include the following. If Bonnie as Gerald's agent can make transfers without consideration from the money market account to Tim and Jill at Gerald's express direction in violation of the terms of Gerald's POA, and Tim and Jill do not contend that those actions by Bonnie were improper, was Bonnie barred from taking similar actions to transfer funds from the money market account at Gerald's purported direction, or is the analysis different legally and factually in light of the amounts transferred to Bonnie and/or her status as Gerald's agent?

¶86 Because of the factual dispute, and because the parties have not clarified the law in this area sufficiently, we cannot state that there is no genuine issue of material fact, or that Tim and Jill are entitled to judgment as a matter of law, on the question of whether Bonnie's purported "good faith" regarding the $170,000 of transfers to the CDs is a complete defense concerning a breach of fiduciary duty she owed to Gerald regarding that $170,000. In addition, the circuit court may need to resolve other factual issues regarding Tim and Jill's request for declaratory relief that are not determined by this opinion.

## IV. Tim and Jill's Claim That Bonnie Tortiously Interfered With Their Expected Inheritance.

¶87 Bonnie makes no argument regarding Tim and Jill's cause of action concerning Bonnie's alleged tortious interference with their expected inheritance that is separate from her arguments concerning Till and Jill's request for declaratory relief. The disputed facts described above must be resolved in the context of this cause of action also, and other elements regarding this cause of action must also be resolved on remand. Accordingly, we reverse the circuit court's summary judgment order on this claim and remand for further proceedings.

## V. Tim and Jill Stated Valid Causes of Action.

¶88 Separate from Bonnie's other arguments, Bonnie asserts that Tim and Jill have failed to state valid causes of action because their requests for relief were filed after Gerald died. Bonnie asserts that any challenge of her conduct must be brought during Gerald's life.

¶89 In support of her argument, Bonnie relies on WIS. STAT. § 244.16(1) which provides in pertinent part: "The following persons may petition the circuit court of the county where the principal is present or of the county of the principal's legal residence to construe a power of attorney or review the agent's conduct, and grant appropriate relief…." Bonnie argues that § 244.16(1) requires that the principal be alive when a claim is filed under that subpart because, once a principal dies, he or she is no longer "present" in a county and no longer has a "legal residence" there. Bonnie also relies on WIS. STAT. § 244.10(1)(a) which states that a power of attorney terminates when the principal dies. *See id.*

¶90   Bonnie's argument fails.   Those statutes set forth the venue of a dispute regarding an agent's action while the principal is alive.  The statutes do not require that beneficiaries' claims against an agent must be initiated while the principal is alive.

## CONCLUSION

¶91   For the foregoing reasons, the order of the circuit court is reversed and the cause is remanded for further proceedings consistent with this opinion.

*By the Court.*—Order reversed and cause remanded.

This opinion will not be published.   *See* WIS. STAT. RULE 809.23(1)(b)5.